Davis, J.,
delivered the opinion of the court:
This court has now delivered three opinions upon general issues raised in the French Spoliations Cases. The first related to the broad questions as to the validity, against France, of the claims as a class, and the resulting liability of the United States to the claimants; the second was directed more especially to forms of pleading, the value of evidence, and rights of insurers; while the third disposed of a motion made by the defendants for a rehearing of the general questions discussed in the first opinion. (Gray, administrator, v. The United States, 21 C. Cls. R., p. 340; Holbrook, administrator, v. The United States, 21 C. Cls. R., p. 334 ; Cushing, administrator, v. The United States, ante, p. 1).
A large number of cases have since been argued and submitted to the court, and certain general questions ared'ound raised in many of them. Those questions we shall now proceed to discuss, as well as two points which were sent back by the court for further argument.
It is urged by the claimants that the treaties of 117.8 remained in force, notwithstanding the abrogating act of July 7,1798, until "the final ratification of the treaty of 1800, and that these treaties prescribe the rule by which all the spoliation claims are to be measured. This position is denied by the Government.
For the purpose of this branch of the case, the period of the spoliations may be divided into two parts: that prior to July 7,1798, and that subsequent thereto and prior to the ratification of the treaty of 1800.
As to the first period, we find the position on both sides to have been consistént, which a few citations covering different years will clearly show.
*412 In February, 1793, the National Convention granted substantial favors to the United States, among them opening the ports of the colonies to American ships, and granting to produce carried in American bottoms duties the same as those imposed upon French vessels (Senate, 19th Cong., 1st. sess., Doc. 102, p. 35). This was followed' by the decree of March 2G, 1793, granting new favors to what the Convention called their “ ally nation” (ibid., p. 36). Soon after this M. Le Brun, the minister of foreign affairs, replying to a complaint from our minister, Mr. Morris, said that he had requested the minister of marine “ to prevent in the future the vessels of our good allies from being exposed to the attacks of our ships of war and privateers” (ibid., p. 38). Upon the 9th May, 1793 (ibid., p. 42) the Convention passed a decree authorizing the arrest of neutral vessels laden wholly or in part with neutral property and bound to an enemy port, or laden with enemy merchandise. Mr. Morris immediately demanded that the United States be exempted from the operation of this decree as contrary to the terms of the treaty of commerce (ibid., p. 44). Mis request was complied with, the Convention’s action in this regard being based upon the sixteenth article of that treaty (ibid., p. 46).
Now occurred a curious incident in legislative history. Five days after the passage of the exemption the Convention reversed its action. Mr. Morris protested (ibid., p. 47), and the 1st July the Convention again decreed “ that the vessels of the United States are not comprised in the dispositions of the decree of the 9 th May, conformably to the sixteenth article of the treaty concluded the 6th of February, 1778.” July 27th this exception was annulled and the United States were again thrown under the effect of the original decree of the preceding May (ibid., p. 50). Morris wrote Jefferson, then Secretary of State: “ The decree respecting neutral bottoms, so far as it respects the vessels of the United States, has, you will see, been bandied about in a shameful manner, I am told, from Havre, that it is by the force of money that the determinations which violate our rights have been obtained; and, in comparing dates, events, and circumstances this idea seems to be but too well supported” (ibid., p. 52). Prior to this Mr. Morris had written the minister of foreign affairs asking that the matter be fixed definitely, otherwise “we must expect'to see that *413 species of dispute multiplied, in which cupidity on the one hand and fear on the other will give place to calumnious insinuations, which lead uninformed persons to think that the interests of individuals might influence the national decisions ” (ibid., p. 47). This note was followed by the exemption of July, soon after which Morris laid before the foreign office more specific charges [ibid., p. 51), notwithstanding which the exemption was again reversed. In all this transaction the existing force of the treaties of1778 was nowhere denied, and in the two exceptions, was expressly admitted.
At this time Genet was carrying on his objectionable course in the United States under the shelter, as he contended, of the treaties, whose binding effect Mr. Jefferson did not deny, while he disputed Genet’s construction of them (ibid., pp. 53 et seq.).
Mr. Morris still endeavored to secure exemption from the May decree, but without success, and finally he wrote, during October, 1793, that in effect the minister of foreign affairs had acknowledged and lamented to him the impropriety of the decree, “but unable to prevail over the greater influence for the repeal of it, he is driven to the necessity of exercising a step which it is not possible to justify. There is no use in arguing with those who are already convinced, and where no good is to be expected some evil may follow. I have, therefore, only stated the question on its true ground, and leave to you in America to insist on a rigid performance of the treaty or slide back to the equal state of unfettered neutrality” (ibid., p. 75).
Mr. Monroe now succeeded Mr. Morris in Paris, and writing home that he “ felt extremely embarrassed how to touch again upon their [the French] infringement of the treaty of commerce, whether to call on them to execute it, or leave that question on the ground I had first placed it. * * * Upon full consideration I concluded that it was the most safe and sound policy to leave this point where it was before” (ibid., p.85). He evidently made a distinction between “ advising and pressing” the execution of the treaty and insisting upon its execution. Instead of demanding its execution as a right he advised it as a politic act on the part of France, fearing that a more decided course on his part would lead to a counter demand for the execution by the United States of the guarantee clause. To this communication Monroe received from the Secretary of State a rather *414 tart response, of which this is the important paragraph (ibid., p. 87):
“ The fourth head of inquiry stated in your letter shows that you were possessed of cases which turned entirely upon the impropriety of the decree, and such, too, was certainly the fact. Now, without the abrogation of the decree, so far as it represented those cases, the redress which you were instructed to demand could not be obtained. In truth there was no cause or pretense for asking relief but upon the ground of that decree having violated the treaty. Does not this view lead to the inevitable conclusion that the decree, if operative in future instances, would be no less disagreeable, and consequently that its operation in future instances ought to be prevented, a circumstance which could be accomplished only by a total repeal?”
Soon after this the Convention resolved to carry into strict execution the treaty of commerce of 1778 (ibid., p. 88), so that the year 1795 opened with a similar understanding on each side as to the enduring force of the treaty.
At this time commenced to circulate in France reports as to what Mr. Jay had been doing in England. Mr. Monroe thought the utmost cordiality had been restored between the two Republics, and yet feared that the prospect had become clouded by the rumors from England. In August, 1795, newspapers reached Paris, which contained the text of the Jay treaty (ibid., p. 127), and so much feeling was aroused that, after considerable delay, it was decided"to send an envoy to the United States to declare to our Government the dissatisfaction of the French in “ respect to our treaty with Great Britain and other acts which they deemed unfriendly to them” (ibid., p. 129); a course which Monroe endeavored to prevent.
Thereupon followed,in March, 179G (ibid.,p. 131),a “summary exposition of the complaints of the French Government against the Government of the United States,” in which an infraction of the treaties is relied upon as a legitimate grievance, and in answering which Monroe (ibid., p. 135) tácitly admits by his argument the enduring force of those treaties.
The Jay treaty was ratified, news thereof reached Paris (ibid,, p. 142), and the threatening cloud burst.
The minister of foreign affairs informed Mr. Monroe that the Directory regarded the Jay treaty as a breach of friendship, and saw “ in the stipulations which respect the neutrality of *415 the flag an abandonment of the tacit engagement which subsisted between the two nations on this point since the treaty of commerce of 1778. * * * After this, citizen minister, the Executive Directory thinks itself founded in regarding the stipulations of the treaty of 1778 which concern the neutrality of the flag as altered and suspended in their most essential parts by this act, and that it would fail in its duty if it did not modify a state of things which would never have been consented to but upon the condition of the most strict reciprocity” (ibid., p. 143). Monroe argued in reply that the treaty of 1778 had not been violated, closing with a renewal of his complaints of French conduct in regard to American commerce.
Pinckney was now ordered out to succeed Monroe, but before he reached Paris France gave notice of intended reprisals (ibid., p. 147), and in October (1796) Monroe received a copy of the Executive Directory’s decree of July 2,1796, with notice that it would bo applied to the United States, and that his functions as minister were suspended (ibid., p. 148). The decree provided that France should treat all “ neutral vessels, either as to confiscations, as to searches or captures, in the same manner as they shall suffer the English to treat them.” In communicating the decision of his Government, however, the French minister was careful to state that “the ordinary relations subsisting between the two people, in virtue of the conventions and treaties, shall not on this account be suspended.” Pinckney arrived, but was not received, and Monroe was dismissed with language which Mr. Adams described as “ studiously marked with indignities towards the Government of the United States.”
This brings us to the close of 1796, and however strained the relations of the two countries had become, neither had yet endeavored to throw off the yoke of the treaties; on the contrary, all discussion was founded upon them as still in force.
In February, 1797, the French minister of foreign affairs claimed the benefit of the treaty in a fallacious argument as to the róle d’équipage, suggesting incidentally that “ the Fed eral Government doubtless had never ceased to look upon the treaty of 1778 as obligatory upon the two nations” (ibid., p. 156).
The decree of the Executive Directory of March 2, 1797, which is very harsh upon neutrals, speaks of the treaties as existing in a shape modified by the Jay treaty (ibid., p. 160). In April succeeding, the condemnation of an American vessel is *416 excused as in accordance with treaty; and this is again done in the following November. The instructions to Pinckney, Marshall, and G-erry (July 15, 1797) recognized the treaties as still in force (ibid., p. 453); and the 18th March, 1798, Talleyrand based his complaints upon them (ibid., p. 493). Finally Congress found it necessary by statute to declare the treaties abrogated; an action clearly useless if they were non-existent; an action which in effect admitted their continuing force to that day.
The treaties of 1778, particularly the treaty of commerce,, which is the important one for our purposes, were in existence until the passage of the abrogating act. Whatever disputes occurred between this country and France during the disturbed period following the conclusion of the Jay treaty arose from differences of interpretation of various clauses of the Franco-American treaty, and on neither side do we find seriously advanced a contention that the treaties were not in existence and were not binding upon both nations. The United States distinctly urged their enduring force, while the French departed from this position only in this (if it be a departure), that the Jay treaty introduced a modification into their treaty with us, of which they were entitled to the benefit.
We are of opinion that, the treaties of 1778, so far as they modified the law of nations, constituted the rule by which all differences between the two nations were to be measured after February 6, 1778, and before July 7, 1798.
As to the period after July 7, 1798:
On that date the abrogating act passed by'the Congress was approved by the President and became a law within the jurisdiction of the Constitution'; a law replacing to that extent the treaties, and binding upon all subordinate agents of the nation, including its courts, but not necessarily final as the annulment of an existing contract between two sovereign powers,
A treaty which on its face is of indefinite duration and which contains no clause providing for its termination may be annulled by one of the parties under certain circumstances. As between the nations it is in its nature a contract, and if the consideration fail, for example, or if its important provisions be broken by one party, the other may, at its option, declare it terminated. The United States have so held in regard to the Clayton-Bul- *417 wer treaty, as to which Mr. Frelinghuysen, then Secretary of State, wrote Mr. Hall, minister in Central America (July 19, 1884):
“The Clayton-Bulwer treaty was voidable at the option of the United States. This, I think, has been demonstrated fully on two grounds. First, that the consideration of the treaty having failed, its object never having been accomplished, the United States did not receive that for which they covenanted; and, second, that Great Britain has persistently violated her agreement not to colonize the Central American coast.”
Here concur two clear reasons for annulment, failure of consideration and an active breach of contract.
Abrogation' of a treaty may occur by change of circumstances, as:
“When a state of things which was the basis of the treaty, and one of its tacit conditions, no longer exists. In most of the old treaties were inserted the clausula rebus sie stantibus, by which the trea ty might be construed as abrogated when material circumstances on which it rested changed. To work this effect it is not necessary that the facts alleged to have changed should be material conditions. It is enou gh if they were strong inducéments to the party asking abrogation. . *
“The maxim lGonventio omnis intelligitur rebus sie stantibus’ is held to apply to all cases in which the reason for a treaty has failed, or there has been such a change of circumstances as to make its performance impracticable except at an unreasonable sacrifice.” (Wharton’s Com. Am. Law., § 1(11. )J
“ Treaties, like other contracts, are violated when one party neglects or refuses to do that which moved the other party to engage in the transaction. * * * When a treaty is violated by one party in one or more of its articles, the other can regard it as broken and demand redress, or can still require its observance.” (Woolsey, § 112.)
The United States annulled, or at least attempted to annul, the treaties with France upon the grounds, stated in the preamble of the statute, that the treaties had been repeatedly violated by France, that the claims of the United States for repar ation of the injuries committed against them had been refused ■hat attempts to negotiate had been repelled with indignity and that there was still being pursued against this country a system of “ predatory violence infracting the said treaties and hostile to the rights of a free and independent nation.” Such were the charges upon which was based the enactment that ■ “ the United States are of right freed and exonerated from the. *418 stipulations of the treaty and of the consular convention heretofore concluded between the United States and France, and that the same shall not henceforth be regarded as legally obligatory on the Government or citizens of the United States.”
The treaties therefore ceased to be a part of the supreme law of the land, and when Chief-Justice Marshall stated, in July, 1799 (Chirac v. Chirac, 2 Wheaton, 272), that there was no treaty in existence between the two nations, he meant only that within the jurisdiction of the Constitution the treaties had ceased to exist, and did not mean to decide, what it was exclusively within the power of the political branch of the Government to decide, that, as a contract between two nations, the treaties had ceased to exist by the act of one party, a result which the French ministers afterwards said could be reached only by a successful war.
The only question we have now to consider is that of the international relation. The annulling act issued from competent authority and was the official act of the Government of the United States. So far as it was within the power of one party to abrogate these treaties it was indisputably done by the act of July 7, 1798. Notwithstanding this statute, did not the treaties remain in effect to this extent, if no further, that they furnish a scale by which the acts of France, which we are charged to examine, are to be weighed; and in considering the legality of those acts are we not to follow the treaties where they vary the law of nations 1 The claimants in very learned and philosophical arguments contend for the affirmative.
In the first place we are referred by them to the course of the Executive; this, it is said, is binding upon the judiciary, and is favorable to their contention. This position we will first examine.
In 1829 the Supreme Court had occasion to construe the treaties relating to the purchase of Louisiana, particularly that of San Ildefonso. The Executive had already given an interpretation to that instrument, and Marshall, Ch. J., who delivered the opinion of the court, said on this point (Foster et al. v. Neilson, 2 Peters, 253):
“ In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own Government. There being no common tribunal to decide between *419 them, each determines for itself on its own rights, aDd if they cannot adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the Government to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous. We think, then, however individual judges might construe the treaty of San Ildefonso, it is the province of the court to conform its decisions to the will of the legislature if that will has been clearly expressed” (p. 307).
In United States v. Arredondo (6 Peters, 711) and in Garcia v. Lee (12 Peters, 511) this principle was acknowledged and affirmed, while later in Williams v. Suffolk Insurance Company (13 Peters, 415) the court said as to the recognition of Buenos Ayres (p. 420):
“ And can there be any doubt that when the Executive branch of the Government, which is charged with our foreign relations, shall in its correspondence with a foreign nation assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department? And in this view it is not material to inquire, nor is it the province of the court to determine, whether the Executive be right or wrong. It is enough to know that in the exercise of his constitutional functions he has decided the question. Having done this under the responsibilities which belong to him it is obligatory on the people and Government of the Union. * * * In the cases of Foster and Nelson (2 Peters, 253, 307) and Garcia v. Lee (12 Peters, 511) this court have laid down the rule that the action of the political branches of the Government in a matter that belongs to them is conclusive.”
We find in Phillips v. Phillips an even stronger affirmance of this position when the court say that in cases like it “the judicial is bound to follow the action of the political department of the Government and is concluded by it” (92 U. S. R., 130).
The action of the Executive is, then, conclusive upou the judiciary when that action is taken within the jurisdiction given by the Constitution. That instrument marks out with marvelous clearness and foresight the duties assigned to each of the three branches of Government therein created; within its own domain each of these branches is supreme, the executive no less than the legislative, the legislative no less than the judiciary, and the judiciary no less than either of the other two. *420 How does this rule apply to the cases now before ns? The legislature, with the President who approved the bill, have annulled the treaties to the extent of whatever power they may have had in the premises, which is all the power possessed by the United States over the subject-matter. Bo subsequent acts of the Executive alone under these circumstances, acts done in an effort to procure compensation for injured citizens, statements made and positions assumed in a negotiation, many of them perhaps taken argumentatively, others perhaps advanced in an effort to reach a middle ground upon which both parties could stand and which would result in substantial advantage to the nation and its individual citizens; do such acts, statements, or positions necessarily bind us here ?
The statute which gives us all the jurisdiction we have over these claims requires us to examine, not those claims which the United States advanced, but those claims of specified classes which were “valid” “upon the French Government.” It cannot be seriously contended that because the Executive pressed a claim that the claim was therefore “valid” as between the nations. The Act clears any doubt on this point, if there could be any, by prescribing the test we are to apply in ascertaining the validity of a claim; that test is “the rules of law municipal and international and the treaties of the United States applicable to the same.”
The distinction we have heretofore made must be emphasized between the position and jurisdiction of this court under this very exceptional statute, and their position and jurisdiction, or those of any other court of the United States, when acting under general laws, whether statutory or unwritten.
Because the President urged a claim upon France it did not necessarily become as between France and the United States a “ valid” claim. The rule as to the effect of Executive decision applies as well in France as in the United States; France resisting the claim may contend with equal force that her position is correct, and yet one of the parties to the dispute must be wrong. This reductio ad absurdum seems hardly necessary, and yet it serves to illustrate the distinction we seek to make clear as to this'court’s peculiar jurisdiction. Suppose the decision of the Executive, even in the case assumed, be binding upon the judiciary administering the law within the United States, and the authorities do not go to this extent, still it does *421 not follow that such a decision upon any of these claims is binding upon us now. We are instructed to discover, not what the Excutive believed or contended for or argued, but what claims were in fact and in law “valid”as against France, and valid by the rules of law, municipal and international, and the treaties.
The contention has, however, other aspects, which must have serious examination 5 and it therefore becomes necessary to see what was the contention of this Government as to the treaty rules after the passage of the annulling statute. For this purpose we must again turn to the correspondence.,
It is well to bear in mind that the question of the guarantee had well nigh, been eliminated from discussion. France had never formally asked its enforcement; on the contrary, had preferred that we should remain at least nominally neutral that she might reap the benefit of our food supply. • Monroe had feared that too strong a position on our part might bring about a demand for the aid pledged; but Pickering had no apprehension, and clearly regarded the obligation as without practical danger. Fear of the guarantee hampered our officers: but the real practical difficulty on the French side was the Jay treaty; on ours, the spoliations.
Monroe was dismissed; Pinckney was not received; the Pinckney, Marshall, Gerry mission was not officially recognized, and they had returned home, when, in October, 1799, Mr. Pickering, Secretary of State, addressed to Messrs. Ells-worth, Davies, and Vans Murray, the newly appointed ministers to France, their instructions, in which under thirty different heads, concluding with seven ultimata he set forth the position of the United States. He told them that the conduct of France would well have justified an immediate declaration of war, but desirous of maintaining peace and being willing to leave open the door of reconciliation, the “ United States contented themselves with preparations for defense, and measures calculated to protect their commerce” (Doc. 102, p. 561). The claims for “ spoliation” are to be advanced immediately as an indispensable condition of a treaty, and all captures and condemnations are to be deemed “irregular or illegal when contrary to the law of nations generally received and acknowledged in Europe, and to the stipulations in the treaty of amity and commerce of the 6th of February, 1778, fairly and ingenuously interpreted, *422 while that treaty remained in force, especially when made and pronounced.”
In this instruction, then, Mr. Pickering draws the line very distinctly between the standard of demand as to claims arising prior to the annulling statute and those founded upon acts committed subsequent thereto. Further on he says (ibid., p. 570):
“ The seventeenth and twenty-second articles of the commercial treaty between the United States and France of February 6, 1778, have been the source of much altercation between the two nations during the present war. The dissolution of that and our other treaties with France leaves us at liberty with respect to future arrangements; with the exception of the now preferable right secured to Great Britain by the twenty-fifth article of the treaty of amity and commerce. In that article we promise mutually that while we continue in amity, neither party will in future make any treaty that shall be inconsistent with that article or the one preceding it. We cannot, therefore, renew with France the seventeenth and twenty-second articles of the treaty of 1778. Her aggressions, which occasioned the dissolution of that treaty have deprived her of the priority of rights and advantages therein stipulated.”
He speaks of the “ dissolution ” of the treaties as of an existing fact, says the United States can make no treaty, that is, no new treaty inconsistent with the Jay treaty, that therefore they cannot “renew” — note the word — certain articles of the French treaty; in short, the whole instruction is founded upon an admission at least, if not an assertion, that the treaties no longer were in force.
The newly-appointed ministers, acting under these instructions, opened negotiations by proposing to arrange, first, claims of citizens of either nation, whether founded on contract, treaty, or the law of nations, and then, to stipulate for reciprocity and freedom of commercial intercourse (ibid., p. 580). The -French, however, thought the first object of negotiation should be “ the determination of the regulations and the steps to be followed for the estimation and indemnification of injuries for which either nation may make claim for itself, or for any of its citizens. And the second object is to assure the execution of treaties of friendship and commerce made between the two nations ” (ibid., p. 581); We have already so fully considered the details of this long negotiation (21 C. Cls. R., pp. 340, et seq.) that they need not now be repeated. A careful re-reading of *423 all the correspondence which we have been able to obtain on this subject but confirins our previous conclusion that—
“Starting under their instructions, events had forced the ministers to offer unlimited recognition of the treaties of 1778, coupled with a pecuniary equivalent to extinguish in the future their most onerous provisions; even this was not accepted, and the French, returning to their original ground, said that no indemnity could be granted unless the treaties were recognized without qualification as to the future, and this they said with the avowed object of avoiding the payment of indemnity.” '
The American ministers recognized that the French contention had substantial value, so much so that they offered 8,000,000 francs to settle it; but they did not recognize that it was correct in fact or law, or that the annulling act was without effect. On the contrary they argued:
“A treaty being a mutual compact, a palpable violation of it by one party did, by the law of nature and of nations, leave it optional with the other to renounce and declare the same to be no longer obligatory. * * * For a wrong decision it would doubtless be responsible to the injured party, and might give cause for war; but even in such case, its act of public renunciation being an act within its competence would not be a void but a valid act, and other nations whose rights might thereby be beneficially affected would so regard it.” (Doc. 102, p. 612.)
Finally, the second article of the treaty of 1800, as signed in Paris, expressly stated that the ministers plenipotentiary of the two parties were not able to agree respecting either the treaties or indemnities. These points then remained as they were at the opening of the negotiation.
We fail to find that the Executive did, after the passage of the annulling statute, recognize the existing force of the treaties as an international obligation, whatever value may have been accorded to the claim of France that one party was without power to abrogate them.
The course of the Executive in the long contentions with France is not binding upon us now under the jurisdiction given by the statute of January, 1885. That statute grants a very peculiar power, imposes upon us a very original duty — that of examining in the light of law, municipal and international, and in the light of the treaties, the validity of the claims of this Government against that of France. Such a grant of jurisdictional power necessarily negatives any binding presumption *424 founded upon Executive action. The President, individually and through the Secretary of State, expressly and repeatedly demanded satisfaction of the spoliation claims. This was of course known to the legislature which directed us to investigate these very claims. The Congress does not do a vain act, and to require us to examine the validity of claims under a rule of law which presupposes them to be valid because the Executive urged them in diplomatic negotiation would be vain. The intention of the statute is that we shall not be concluded by the President’s position in these negotiations, but shall, under the standard set for us, inquire afresh as to the claims’ “validity ” against France. Even if this were not so, still there is nothing in the action of the Executive, after the act of 1798, tending to show an intention to recognize the continuing existence of the treaties. On the contrary, the whole argument proceeded upon the opposite hypothesis.
Claimants contend that not the act of 1798 but the agreement to expunge the second article of the treaty of 1800 terminated the treaties of 1778. The rescission of that article undoubtedly terminated the dispute as to the existence of these treaties and removed that dispute from the forum of international discussion. We are not prepared to admit that it recognized as valid the contention of France as to the treaties, although it recognized that the contention had substantial value. A claim may be admitted to have value for purposes of negotiation or compromise without an admission of its validity in fact or law. This is true in private affairs, and is especially true in diplomacy where questions of national pride, tradition, custom, and pique have to be considered most carefully and often are of most serious importance.
Counsel urge that France insisting the treaties remained in force should be bound by them, and they make the apt illustration that if the two nations had agreed at the time upon mutual indemnities France would have been held to the treaty rules. This assumption is probably correct. France having obtained the benefit she desired would injustice be bound by the corresponding obligation. “ Qui sentit eommodum sentiré debet et onus.” But that is not this case, for France entirely failed to secure a recognition of the continuing force of the treaty.
The treaty of 1800 contained a provision that “ property captured and not yet definitively condemned ” should be restored *425 upon production alone of the passport of 1778. These captures must, in almost all instances if not in all, have taken place subsequent to the annulling statute, and it is urged with much force that if the treaties were non-existent France was entitled to demand the proofs required by the general law of nations; as she expressly yielded this point and, as to these cases, agreed to abide by the treaty rule, therefore it cannot be doubted (urge counsel) that had these claims now before us been taken into the treaty of 1800 they would have been subjected to the same standard.
Perhaps they would have been. France, obtaining treaty recognition, would have been bound by treaty rules; but this did not occur, and as France failed to obtain treaty recognition is she therefore to be bound by treaty rules because in one instance she made a special exception in specific terms % We think not. Á treaty changes the law of nations only in so far as it contains provisions to that effect. The parties may covenant that as between themselves the law of nations shall not apply in particular instances; except in those instances that law remains in force.
The treaties had served their purpose; the conditions which they contemplated had changed. Whatever may have been the justice of French complaints of our course with Great Britain, and whatever may have been her rights under the circumstances, still she had so invaded the rights of the United States to free commerce in innocent cargoes upon the high seas, that a case was presented of such failure of consideration, and of such active infraction of the treaties, that this country was in a position to proclaim them ended.
Free ships, free goods, had become a dead letter. The passport which the treaty prescribed as a sufficient protection was disregarded, and various other aggressions upon the shipping of the United States were committed; aggressions admittedly forbidden by the treaty provisions.
We are of opinion that the circumstances justified the United States in annulling the treaties of 1778; that the act was a valid one, not only as a municipal statute but as between the nations; and that thereafter the compacts were ended. We fail to find any agreement by France as to these claims to submit to the treaty rules after July 7,1798, the treaties not being recognized by us, and we conclude that the validity of *426 claims not expressly mentioned in the treaty of 1800, which arose after July 7,1798, is to be ascertained by the principles of the law of nations recognized at that time, and not by exceptional provisions found in the treaties of 1778.
Insurance to cover is that amount of insurance which in case of accident will entirely reimburse the insured for his loss. It includes not only the value of the property, but also the cost of the insurance procured to protect it.
Phillips in his work on insurance thus states the question argued here (§ 1221):
“ The premium on the premium is to be included in computing the amount to be insured in order to cover the interest and replace the exact value of the subject in case of total loss.”
Some of the claimants ask that they be allowed unpaid premiums of insurance as an element of the value of property lost, and if so that such premium be allowed upon the theory of insurance to cover.
The able arguments and briefs of counsel for claimants on these questions have been listened to and examined with great care. Whatever difficulty we might find were the matter here presented for the first time is removed by the precedents established by the Supreme Court. In the Anna Maria (2 Wharton, 325) the court allowed “the value of the vessel and the prime cost of the cargo with all charges, and the premium of insurance, where it has been paid, with interest.” In Malley v. Shattuck (2 Cranch, 458) the court said (citing The Charming Betsey):
“ In pursuance of that rule the rejection of the premium for insurance, that premium not having been paid, is approved; but the rejection of the claim for outfits of the vessel and the necessary advance to the crew is disapproved. Although the general terms used in the case of The Charming Betsey would seem to exclude this item from the account, yet the particular question was not under the consideration of the court, and it is conceived to stand on the same principle with the premium of the insurance, if actually paid, which was expressly allowed.”
Following the Supreme Court we shall allow premiums of insurance when actually paid, and not otherwise.
In cases heretofore submitted a question arose as to the effect upon claimants’ rights of the following facts, or either of them, should they or either of them be found to exist:
A. That the vessel acted as a privateer.
*427 B. That the vessel possessed the license or authority described in either the Act of June 25,1798, or in the Act of July 9,1798, authorizing the class of seizure described in those acts or in the Act of May 28, 1798.
These questions were ordered to be and have been reargued.
The jiro visions of the three laws above recited are very different in effect, that of the latest date being the one most important in the consideration of these cases. The Act of May 28 (1 Stat. L., 561), “to more effectually protect the commerce and coasts óf the United States ” empowered the President to give certain orders to the armed vessels of the nation and contained no allusion to vessels owned by individuals. The Act of Jume 25 (ibid, p. 572) authorized “the defense of the merchant vessels of the United States against French depredations,” and to that end allowed the commanders and crews of such vessels to “ oppose and defend against any search, restraint, or seizure” attempted by a French vessel, to “ repel by force any assault or hostility ” on the part of such French vessel, to “ subdue and capture the same ” and to retake any American vessel captured by the French.
The Act of July 9 (ibid., p. 578) gave to private armed vessels specially commissioned the same license and authority “for the subduing, seizing, and capturing any armed French vessel, and for the recapture of the vessels, goods, and effects of the people of the United States, as the public armed vessels of the United States may by law have” (§ 2). This statute, therefore, authorized private armed vessels to take any armed French vessel “found within the jurisdictional limits of the United States or elsewhere on the high seas ” (§1), and to recapture American vessels taken by the French. (See Acts May 28 and June 25, 1798.)
Many of the vessels whose cases are before us carried armament of some kind, and several are shown to have had a special license, commission, or authority issued probably by virtue of the power given the President in the last two acts of Congress."
The marked distinction between the act of June and that of July is in this: The former permitted defense only, except in the matter of recapture, while the latter authorized attack, but attack only on armed vessels. No where in the statutes is there any permission given to molest French merchantmen, although France was then engaged in the acts of illegal seizure and con- *428 dem nation from which the spoliation claims arose. Defendants nrgo that the arming of a merchantman and the presence on hoard of a special license under the acts cited destroyed any right of recovery as against France and consequently as against the United States.
We have held (Gray’s Case, 21 C. Cls. R., 375) as to the relations between the two countries during the period in question that “ no such war existed as operated to abrogate treaties, to suspend private rights, or to authorize indiscriminate seizures and condemnations; that, in short, there was no public general war, but limited war, in its nature similar to a prolonged series of reprisals.” There was not what Wheaton calls “ a perfect war,” but a war “ limited as to places, persons, and things;” the Congress authorized hostilities, but only on the high seas or within the jurisdictional limits of the United States, and then only by certain specified vessels upon certain specified vessels. As far as Congress authorized and tolerated it so far might we proceed in hostile operations, and the word “ enemy” goes the full length of this qualified war and no further (21 C. Cls. R., 371). The hostilities were confined on the side of the United States to attack on French armed ships and to recapture of our own. The capture of enemy mercantile shipping is an important mark of a state of war, one of its principal incidents, and it is significant of the relations between the two Governments that not a movement was made by Congress or the Executive in this direction.
A privateer is an armed vessel belonging to one or more private individuals, licensed by Government to take prizes from an enemy; its authority in this regard must depend altogether upon the extent of the commission issued to it, and is qualified and limited by the laws under which the commission is issued. (The Thomas Gibbons, 8 Cranch, 421.)
Letters of marque and reprisal may theoretically issue in time of peace (articles of Confederation signed 1778, art. 9), as they form a “ mode of redress for some specific injury which is considered to be compatible with a state of peace and permitted by the law of nations” (Kent, vol. 1, p. 61). The commission authorizes “the seizure of the property of the subjects as well as of the sovereign of the offending nation and to bring it in to be detained as a pledge, or disposed of under j udicial sanction in like manner as if it were a process of distress under na *429 tional authority for some debt or duty withheld” (ibid.). Speaking very technically, a letter of marque is merely a permission to pass the frontier, while a letter of reprisal authorizes a “ taking in return, ” a taking by way of retaliation, a captio rei unius in alterius satisfactionem. The colloquial use together of the two names, letter of marque and letter of reprisals, leads sometimes to misunderstanding as to the differing effect of each, one being a simple authority to depart, the other an authority to seize property in compensation for an injury committed.
The licenses or commissions of 1798 contained no hint of intended reprisals, for no authority to seize a French merchantman is contained in them, although the French had long been capturing our commercial marine. There was however express authority to seize armed vessels and to recapture American vessels; that is, in its essence, authority to defend, not to attack.
Within the limits prescribed by the Congress there was war; limited, imperfect war, not general public v ar, but war complete as to the vessels engaged in it to the extent only of the powers given by the Congress. Following in the path marked out by the Supreme Court in the prize cases which came before them during this period, and of which Bass v. Tingey is a fair example, we are led to the conclusion that where a private vessel was fitted for the purpose of attacking armed French vessels, and of recapturing American vessels seized, she fell within the rules of war, and if captured, became legitimate prized The relations of the two nations being strained to hostilities within certain distinctly defined bounds, within those bounds the active agents of either Government were subject to the rules of war, and vessels intending to seize must submit to seizure.
It does not, however, follow that every vessel having a special license under the acts of 1798, or every vessel having some armament on board, falls within this rule. Long within the memory of men now living, many portions of the ocean since freely opened to commerce were infested by pirates who boarded peaceful merchantmen, plundered the vessels, and murdered the crews, or dragged them to the horrors of slavery. The literature relating to the early part of the century is filled with anecdotes based upon the outrages of such freebooters, and the heroic deeds of those sent out by the different Governments *430 to capture or destroy them. Vessels tempting these waters found it advisable to carry some armament, so that failing efficient convoy, or in case of other accident, they might be prepared to cope on comparatively equal terms with these robbers of the sea.
At the particular period we now are considering, to the danger from pirates in some parts of the world was added the danger from French privateers who acted in so illegal and unjustifiable manner as to call from Lord Stowell this opinion:
“ It has certainly been the. practice of this court, lately, to grant salvage on recapture of neutral property out of the hands of the French, and I see no reason at the present moment to depart from it. I know perfectly well that it is not the modern practice of the law of nations to grant salvage on recapture of neutral vessels, and upon this plain principle, that the liberation of a clear neutral from the hand of the enemy is no essential service rendered to him, inasmuch as that same enemy would be compelled by the tribunals of his own country, after he had carried the neutral into port, to release him, with costs and damages for the injurious seizure .and detention. This proceeds upon the supposition that those tribunals would duly respect the obligations of the law of nations; a presumption which, in the wars of civilized nations,each belligerent is bound to entertain in their respective dealings with neutrals. But it being notorious to all Europe, in the present war, that there has been a constant struggle maintained between the governing powers of France, for the time being, and its maritime tribunals, which should most outrage the rights of neutral property — the one by its decrees, or the other by its decisions— the liberation of neutral property out of their possession has been deemed, not only in the judgment of our courts, but in that of neutrals themselves, a most substantial benefit conferred upon them, in a delivery from danger against which no clearness and innocence of conduct could afford any protection. And a salvage for such service has not only been decreed, but thankfully paid, ever since these wild hostilities have been declared and practiced by France, agaiust all acknowledged principles of the law of nations and of natural justice. When these lawless and irregular practices are shown to have ceased, the rule of paying salvage for the liberation of neutral property must cease likewise.
“ No proof is offered that the maritime tribunals of France have, in any degree, corrected either the spirit or the form of their proceedings respecting neutral property generally; and, therefore, I shall not think myself authorized to depart from the practice that has been pursued, of awarding a salvage to the captors.” (The Onslcan, 2 Kobinson, pp. 300, 301.)
*431 And later he said:
“ It is certainly true that the standing doctrine of the court has been that neutral property, taken out of the possession of the enemy, is not liable to salvage. It is the doctrine to tvhich the court has invariably adhered till it was forced out of its course by the notorious irregularities of the French cruisers and of the French Government, which proceeded without any pretense of sanction from the law. of nations, to condemn neutral property. On these grounds it was deemed not unreasonable by neutrals themselves that salvage should be paid for a deliverance from French capture. The rule obtained early in the war, and has continued to the present time. It is said that a great alteration has taken place in the French proceedings, and that we are now to acknowledge a sort of return of 1 Saturnia regna.’ This court is not informed, in a satisfactory manner, that any such beneficial change has taken place in the administration of prize law in the tribunals of France; and, therefore, it will continue to make the same decree till the instructions of the superior court shall establish a different rule.” (.Eleonora Gatharina, 4 Kob., 157. See also Talbot vs. Seeman, 1 Oranch, 1.)
In the Gulf of Mexico the danger of seizure by small vessels, technically French privateers, but actually so irresponsible to governing power as to be in form only superior to freebooters, made the possession of some armament by an innocent trader a matter of wise precaution, if not of necessity, especially as in some instances the danger from the French tribunals was nearly as great as from the privateers. We are told, for example, that vessels were condemned by such tribunals because the ship’s compass had an English brand, because the cooking utensils were of English manufacture, or because the vessel was destined to an English port. The Secretary of State thus characterized the situation:
“American property had even been taken when in their own ports, without any pretense, orno other than that they wanted it. At the same time their cruisers are guilty of wanton and barbarous excesses, by detaining, plundering, firing at, burning, and distressing American vessels.”
The acts of the French privateers were so illegal as to be stigmatized as “piracies” both by Mr. Pickering and in the two Legislative Councils of France (Doc. 102, p. 410).
As early as June, 1793, Morris complains “ of the plundering of our ships, of which complaints are daily made to me and which the present Government of the country is too feeble to *432 prevent” (ibid., p. 48), and he writes to the French minister “ that it will be very difficult, and perhaps impossible, to prevent your privateers from committing illegal and outrageous acts-as long as they are permitted to bring into your ports all the American vessels laden with articles of food for countries at war with France ” (ibid., p. 49). Later he informs the Secretary of State that “ in the present state of the country thq laws are but little respected; and it would seem as if pompous declarations of the rights of man were reiterated only to render the daily violation of them more shocking ” (ibid., p. 52). In October he says “ the courts chicane very much here,” and he speaks of their proceedings as “iniquitous” (ibid., p. 67). In December, 1796 (ibid., p. 151), Major Mountflorence, in his general report as to American commercial interests in France, says that on the 27th of the preceding April power had' been given to the tribunals of commerce in every port of France to take cognizance in the first instance of every matter relative to captures at sea, with an appeal to the civil tribunals of the different departments, and with a reference in certain instances to the minister of justice.
He adds:
“ The tribunals of commerce are chiefly composed of merchants, and most of them are directly or indirectly more or less interested in the fitting out of privateers, and, therefore, are often parties concerned jn the controversies they are to determine upon.”
In illustration he cites the condemnation of the Boyal Gap-tain, saying that most of the “judges were concerned in the capturing privateer.”
In January, 1797, Mr. Pickering wrote to Mr. Pinckney as follows:
“ The commissioners and special agents of the French Republic in the West Indies are destroying our commerce in the most wanton manner. They have issued orders for taking all American vessels bound to or from English ports — not those only which the English occupy in St. Domingo, but those of their own islands. They condemn without the formality of a trial. These orders appear from the information I have" received to have been issued in consequence of letters from Mr. Adet, who, you will see in his note of November 15, said the French armed vessels were not merely to capture American vessels, but to practice vexations towards them; and who, I am further informed, wrote to the commissioners that they *433 could uot treat the American vessels too badly. This state of things can not continue long. It makes little difference whether our vessels go voluntarily to French ports or are carried in as prizes. In the latter case they condemn without ceremony, and, in the former, they forcibly take the cargoes, heretofore with promises of payment, which they generally broke; and now, I am told, without even deigning to give their faithless promises” (ibid., p. 154).
In the following February he writes again to Pinckney, saying (ibid., p. 154):
“ The spoliations on our commerce by French privateers are daily increasing in a manner to set every just principle at defiance. If their acts were simply the violation of our treaty with France the injuries would be comparatively trifling, but their outrages extend to the capture of our vessels merely because going to or from a British port. Nay, more, they take them when going from a neutral to a French port. In truth, there is, in a multitude of cases, little difference whether our vessels are carried in as prizes or go voluntarily to the French ports in the islands for the purposes of traffic; the public agents take the cargoes by force and fix.their own terms, giving promises of distant payment, which are seldom duly performed. With regard to the vessels carried in as prizes, the agents and tribunals of the French Government act in concert with the privateers. The captured are not admitted to defend their property before the tribunals; the proceedings are wholly ex jHirte. We can account for such conduct only on the principle of plunder, and were not the privateers acting under the protection of commissions from the French Government, they would be pronounced pirates. Britain has furnished no precedents of such abominable rapine.”
In April, he writes again (ibid., p. 164) that “ the depredations of the French in the West Indies are continued with increased outrage, and we have advices of captures and condemnations in Europe which apply to no principle heretofore known and acknowledged in the civilized world. ” (See also ibid., pp. 166, 171, 173, 174, 177.)
Citations of this kind might be multiplied, but it seems useless to do so, as the situation is familiar history. Certainly, under these circumstances, some attempt at defense was natural and excusable, if not justifiable.
Judges “ are not to shut their eyes to what is generally passing in the world ” (Blatchford Prize Cases, p. 448), nor as to what has already taken place. In danger from native pirates, in danger from French privateers often as irresponsible *434 (Gushing’s Administrator, ante, p. 1), the mere possession of some armament by a merchantman is devoid of marked significance. It is improbable that any important venture was sent to sea without an effort on the part of the ship-owner to protect his property and that laden on his vessel; cannon enough or muskets enough he would put on board to give his crew a fair chance of escape from a small force. The statute, however, said that no armed merchantman should receive a clearance or permit, or be suffered to depart unless the owners and the master gave bond conditioned, among other things, that the vessel should not commit any depredation, outrage, unlawful assault, or unprovoked violence upon the high seas against the vessel of any nation in amity with the United States (1 Stat. L., p. 573). Under this act no vessel having any armament could proceed to sea without bond first given, and this bond, being coupled in the acts with the issuance of special orders or licem-e, what more natural than for the innocent merchantman, desiring only safe transit of a commercial venture, to receive in return the commission which the act provided should be given him. The Act of July 9 (ibid., p. 578) contains a similar provision, and the result of both statutes is that no private vessel carrying armament could proceed to sea without bond filed in return for which a commission might be issued.
In our view of the case it is vital to note the distinction between armament for protection simply and armament for attack upon armed vessels or for attack upon captured American vessels necessarily in charge of prize crews. A privateer is maintained for profit; the venture is most speculative in its nature, bringing large returns for great risk. Given the right to prey upon the mercantile marine, great armament is not necessary, as combat may be avoided by speed and quickness in manoeuvre. The privateering authorized by the acts of 1798 was of no such nature; not a prize could be taken without conflict, for only armed vessels, or vessels in charge of prize crews, could be seized; not a merchantman was allowed to be molested. A vessel, then, fitting out under the acts of 1798 for the purpose of waging the limited hostility therein permitted, must have been prepared for battle; must have been ready to wage war. She could not mount a few guns and carry a few dozen muskets, with a small crew, when the success of her voyage depended upon the number of well-defended vessels she should send *435 into port for condemnation. A vessel intended to act aggressively under the laws of 1798 would have to fight for every dollar brought into the pockets of the owners, master, and crew, and, knowing this, would proceed to sea with an equipment sufficient for the very serious work contemplated.
One of the vessels holding a commission under the acts of 1798 was a schooner of about 111 tons, old measurement. She had a crew of seven men, carried what was called a letter of marque, two guns, and a cargo of merchandise; she was duly cleared on a trading voyage, with instructions to the master as to the sale of the cargo and the purchase of a return venture. Such a vessel as this could not have been seriously intended to seize French armed vessels or captured American vessels defended by French prize crews. Seven men, all told, were barely enough to navigate the schooner; aside from the master, there were but three to a watch, and on an emergency it is extremely doubtful whether the total force was sufficient to handle the two guns and the vessel at the same time. Possibly some defense might have been made against a boat-load of pirates putting off from the shore while the schooner lay becalmed near it, but it is not within the bounds of possibility that such a vessel, with so slight a crew and so insignificant an armament, should contemplate attack upon a well-defended vessel.
We are told that 365 vessels, of 66,691 tonnage, carrying 6,847 men and 2,723 guns, received commissions under the acts of 1798, prior to March 2,1799. The average tonnage per vessel was then 185 tons, the average crew 16, and the average armament 7 guns. On the other hand, one Government armed vessel (taken for illustration) of 190 tons burthen carried 18 guns and 140 men, while another of 200 tons carried the same armament and crew. So far as has yet appeared to us, no private armed merchantman made a single capture from the French, and we are assured that no such capture was made. So far as concerns the cases now before us, it would be practically impossible for such a capture to be made, for most of the vessels were small, and they were manned only for ordinary navigation and not for war, with an armament insufficient to cope with organized military force. Neither seven nor even sixteen men is a crew for a vessel intended to attack French armed ships or to recapture those manned by prize crews, and no merchantman with so *436 small a crew and laden with valuable cargo would undergo such risk.
That Congress did not contemplate the employment in attack of small or undermanned vessels is shown by the proviso in the act of July 9, 1798, that the bond should be doubled in case “ the vessel be provided with more than one hundred and fifty men,” from which an inference may not unfairly be drawn that not far from one hundred and fifty was considered a fair equipment for a vessel designed to fight. We have seen that the Government war vessels about equivalent in tonnage to the average licensed merchantman carried about one hundred and forty men, and coupling this fact with the act of Congress we reach the result already indicated by common sense, that Congress had in mind, so far as privateers were concerned, fighting ships — those able to attack a French privateer with reasonable hope of success, and not vessels with insignificant crew and armament, bound on a trading voyage, and provided with those slight means of defense which were at the time ordinarily carried by merchantmen for protection.
' That armament, when carried by strictly commercial vessels bound upon trading voyages, was intended for defense is shown by the report of the House Committee, made January 17, 1799 (American State Papers, Naval Affairs, vol. 1, p. 69). They said:
“ Tour committee begs leave to report further, that about the time of the sailing of our ships of war, and before the merchant ships were permitted to arm for their defense, our trade was in such jeopardy at sea and on the coast from French privateers, that but few vessels escaped them; that ruin stared in the face all concerned in shipping, and that it was difficult to' get property insured.”
Hamilton, then Secretary of the Treasury, officially expressed the opinion of his Government as to armed merchantmen in his circular of August 4,1793, as follows:
“The term privateer is understood not to extend to vessels armed for merchandise and war, commonly called with us letters of marque, nor, of course, to vessels of war in the immediate service of the Government of either of the powers at war.”
Twelve days later Jefferson, in an instruction to Morris as to the English ship Jane, which Genet had requested might be ordered to sail, a request authorized, Genet contended, by the *437 twenty-second article of the treaty of commerce, said (Doc. 102, p. 58):
“The ship Jane is an English merchant vessel, employed in the commerce between Jamaica and these States. She brought here a cargo of produce from that island, and was to take away a cargo of flour. Knowing of the war when she left Jamaica, and that our coast was lined with small French privateers, she armed for her defense, and took one of those commissions usually called letters of marque. She arrived here safely without having had any rencontre of any sort. Can it be necessary to say that a.merehant vessel is not a privateer % That though she has arms to defend herself in time of war, in the course of her regular commerce, this no more makes her a privateer than a husbandman following his plow in time of war with a knife or pistol in bis pocket is thereby made a soldier. The occupation of a privateer is to attack and plunder; that of a merchant vessel is commerce and self-preservation. The article excludes the former from our ports, and from selling what she has taken ; that is, what she has acquired by war, to show it did not mean the merchant vessel and what she had acquired by commerce. Were the merchant vessels coming for our produce forbidden to have any arms for their defense, every adventurer who has a boat, or money enough to buy one, would make her a privateer ; our coasts would swarm with them, foreign vessels must cease to come, our commerce must be suppressed, our produce remain on our hands, or at least that great portion of it which we have not vessels to carry away; our plows must be laid aside, and agriculture suspended. This is a sacrifice no treaty could ever contemplate, and which we are not disposed to make out of mere complaisance to a false definition of the term privateers.”
This matter has also been specifically passed upon by the French courts. The ship Fame, Bust, master, was in June, 1799, tried by the tribunal of commerce sitting at Bayonne. Several grounds were relied upon by the captors as authorizing condemnation, all of which were overruled by the tribunal. Among them was the following:
“ Is the letter of marque, of which the vessel was the bearer, .sufficient to cause it to be considered as an enemy
This question was thus answered:
“ Considering the point relative to the letter of marque of which the ship was the bearer. That the French Government without doubt is not ignorant of the delivery ef like letters by the Government of the United States to the vessels of the said United States nor of the terms in which these letters are conceived. That now and up to the present time it *438 has not been manifested that it regarded this circumstance and the act of Congress of the United States of the month of July, 1798, either as a declaration of war, or as hostilities against France, since it has not asked of the legislative body a law declaring the French nation to be in a state of war with the United States of North America. That_ a state of war can not be established or declared without a law of the legislative body. That it does not belong to the tribunals to take notice of any step that a foreign power may take as constituting a state of war between France and itself.
“ That the condemnation demanded, of thesaid ship Name and of her cargo because of the said letter of marque, can not be founded upon any law, and can not and ought not to be pronounced. The said ship besides, not having opposed any resistance, suffered itself to be visited at the summons which was made to it by the said privateer. There is, then, no occasion to accede to the demand of the captors upon this point.” (See Record in case Nathaniel kiohardson, executor of Joshua Richardson et al. v. The United States, No. 5343.)
This case was appealed to the civil tribunal of the department, and thence to the council of prizes, which latter tribunal, on the 13th December, 1800, released the vessel and cargo in accordance with the judgment of the two lower tribunals.
The Pégou carried ten cannon. She was provided with muskets and munitions of war.
The law officer of the French Government having charge of the case made the following points among others (see Pistoye et Duverdy, Prises Maritimes, vol. 2, p. 51):
“It is not enough to have or carry arms to deserve the reproach of being armed for war (p. 52).
“ War armament is for purely offensive usé. This is shown when there is no object in the armament but attack, or at least when everything tends to prove that such is the principal object of the enterprise * * * But defense is a natural right, and means of defense are legitimate in sea-voyages as in all other occurrences perilous to life. A vessel having but a small crew, whose cargo was considerable, was evidently intended for commerce, not for war. The arms found in this vessel were not intended for violence or hostility, but to prevent them; not to attack, but to defend. The point as to war' armament, then, seems to me unfounded.”
The Pégou was discharged with damages to her captain.
In the case of the Friend, of Boston, a letter of marque had been found on board; the vessel was armed for defense; there was no resistance; summons from the privateer was obeyed, and the master’s instructions directed him to avoid acts of *439 offense and to be prudent. The commissaire of the Government urged that these were not reasons for capture. The vessel was condemned oh other grounds. (Pistoye et Duverdy, vol. 1, p. 501.)
Further, Article IY of the treaty of 1800, which relates to “armed” and “unarmed” merchantmen, shows that France did not stand upon the point urged here by the defense, but admitted the right of armament to the extent at least of the cases now before us, as its courts did in the cases cited above.
It is worthy of remark that two classes of license or commission were allowed by the acts of Congress. The first act authorized instructions from the President as to defense only, except that the recapture of American vessels was permitted. The second act allowed capture of armed Frenchmen. In the absence of proof as to which document a vessel possessed there can be no presumption that it was issued under the latter rather than under the former statute; in fact the presumption, which always favors what is natural, might lean towards the possession of instructions under the first act when it appears that the crew was small, the armament light, and the object of the voyage commercial in its nature.
The distinction must not be forgotten between a legal and justifiable seizure and an illegal and unjustifiable condemnation. The seizure of a vessel may be successfully defended upon grounds which would not support a subsequent condemnation, and “prize courts deny damages when there was probable cause for the seizure, and are often justified in awarding to the captors their costs and expenses,” even when the vessel and cargo are decided not good prize and are returned to their owners. (The Thompson, 3 Wall., 155; Jecker v. Montgomery, 13 How., 498; Murray v. The Charming Betsey, 2 Cr., 64.)
We conclude that a vessel fitted for the purpose of seizing French armed vessels and of recapturing American vessels was, when taken, legitimate prize as an actor in the limited war defined by Congress$ but that the mere arming of a merchantman whose object was trade, subordinate to which was the provision for protection, did not authorize seizure and condemnation even if an instruction or license under either of the acts of 1798 were found on board. In these cases, as in every case arising between nations, technicalities must be thrown aside, *440 and the very essence and spirit of the transaction must be discovered by the light of the facts peculiar to each case.
It is urged by the defendants that the British possessions in the West Indies were in a state of blockade and occupied in such manner as properly to be regarded in a state of siege. That, therefore, the condemnations of vessels bound for those ports with cargoes otherwise innocent were legal and justifiable. The argument has turned more particularly upon vessels bound for Martinique, so that for purpose of illustration we will consider the case of that island, formerly a French possession and captured by England during the war.
The defendants’ argument assumes that Martinique was blockaded; that it was practically in a state of siege; that its predominant character was that of a port of military naval equipment; and therefore the seizure of neutral vessels bound to that port was justified, although the cargo was otherwise innocent.
The law of blockade is so clear that while a few citations may be given for the sake of illustration they seem to us hardly necessary.
Kent says: *441 place, so as to render it dangerous to attempt to enter, and there is no blockade of that part where its power cannot be brought to bear.” (Yol. 1, pp. 144-5.)
*440 “ The law of blockade is, however, so harsh and severe in its operation, that in order to apply it, the fact of the actual blockade must be established by clear and unequivocal evidence; and the neutral must have had due previous notice of its existence ; and the squadron allotted for the purpose of its execution must be competent to cut off all communication with the interdicted place or port; and the neutral must have been guilty of some act of violation, either by going in or attempting to enter, or by coming out with a cargo laden after the commencement of the blockade. The failure of either of the points requisite to establish the existence of a legal blockade amounts to an entire defeasance of the measure, even though the notification of the blockade has issued from the authority of the Government itself. A blockade must be existing in point of fact, and in order to constitute that existence, there must be a power present to enforce it. All decrees and orders declaring extensive coasts and whole countries in a state- of blockade, without the presence of an adequate naval force to support it, are manifestly illegal and void, and have no sanction in public law. The ancient authorities all referred to a strict and actual siege and blockade. The language of Grotius is oppidnm, obsessum vel portus elausus, and the investing power must be able to apply its force to every point of the blockaded
*441 The United States have contended that a biockade must be effective to be valid (note b. to Kent, vdl. 1, p. 145) and admitted the principle even as to its own ports during the late war. This question has been very ably discussed in a late note from the Secretary of State, Mr. Bayard, to the minister representing the United States of Colombia, in which, after citing authorities, the Secretary reaches the following conclusions :
“After careful examination of the authorities and precedents bearing upon this important question, I am bound to conclude as a general principle that a decree by a sovereign power closing to neutral commerce ports held by its enemies, whether foreign or domestic, can have no international validity and no extraterritorial effect in the direction of imposing any obligation upon the Governments of neutral powers to recognize it or to contribute toward its enforcement by any domestic action on their part, Such a decree may indeed be necessary as a municipal enactment of the state which proclaims it, in order to clothe the executive with authority to proceed to the institution of a formal and effective blockade, but when that purpose is attained its power is exhausted. If the sovereign decreeing such closure have a naval force sufficient to maintain a blockade, and if he duly proclaim such a blockade', then he may seize, and subject to the adjudication of a prize court, vessels which may attempt to run the blockade. If he lay an embargo, then vessels attempting to evade such embargo may be forcibly repelled by him if he be in possession of the port so closed. But his decree closing ports which are held adversely to him is, by itself, entitled to no international respect. Were it otherwise, the de facto and titular sovereigns of any determinate country or region might between them exclude all merchant ships whatever from their ports, and in this way not only ruin those engaged in trade with such states, but cause much discomfort to the nations of the world by the exclusion of necessary products found in no other market.” (Note, dated April 24, 1885. See also Hall, International Law, §§ 257 and 260; 3 Phillimore, 311 and 516; case of The Sarah Star, B latch - ford’s Prize Cases, 69-87; Lawrence’s Wheaton, pp. 575 et seq.)
Sir William Scott thus laid down the rule :
i
“ To constitute a violation of blockade three things must be proved: First, the existence of an actual blockade; second, -the knowledge of the party supposed to have offended; and, third, some act of violation, either by going in or coming out with a cargo laden after the commencement of blockade.” (The *442 Betsey, 1 Rob. Adm., p. 92. As to Berlin and Milan decrees see Woolsey, § 206.)
Therefore to justify seizure the blockade must be effective, notice must have been given and there must be an attempt .to violate it.
Was Martinique effectively blockaded ?
Defendants have referred us to no authority to show that it was, and we have made such examination as the sources of historical investigation on this subject afforded without finding’ any statement to that effect. The records of the numerous spoliation cases in this court which have been brought to our attention throw no light on the subject, as they proceed upon the fact that the condemned vessel was bound to an enemy port or laden with enemy produce and the condemnations rest upon French decrees.
An examination of the history of Anglo-French naval operations directly affecting the W est Indies discloses the following events:
February 2d, 1794, an English expedition sailed from the Barbadoes to attempt the capture of Martinique, then under the command of General Bochambeau. This expedition consisted of three ships of the line, eight frigates, four sloops, two store-ships, and one bomb, under command of Vice-Admiral Sir John Jervis, carrying-something less than 6,100 troops, commanded by Lieutenant-General Sir Charles Grey. The French garrison was insignificant in number, consisting only of some 600 men, including 400 militia, while at Fort Boyal was a 28-gun frigate, afid at St. Pierre an 18 gun corvette. Possibly a privateer or two was also available. The British arrived off the island the 5th of February, and some idea may be gained of the heroic defense of the French from the fact that with the overwhelming force at their command the British did not obtain a surrender until the 22d of March. The forts were garrisoned, Lieutenant-General Prescott was given command, a small squadron, under Commodore Thompson, was left to co-operate with him in case of attack, and the rest of the expedition embarked the 31st March to attack St. Lucie (James’ Naval History, vol. 1, pp. 217, et seq.), which surrendered without the loss of a life upon the 4th of April. Then followed the conquest of Gran de-Terre, another expedition having taken the three small islands adjacent to Guadaloupe, called *443 the “ Saintes,” and on the 20th April all Guadaloupe and its dependencies surrendered, comprising the islands of Marie Galante, Desirade, and the Saintes, at an expense of two British rank and file killed, four rank and file wounded, and five missing. A French 16-gun corvette was captured in this expedition, but was not deemed fit for service.
Early in June a French squadron of two frigates, one corvette, two large ships armed en flute, and five transports anchored off the village of Gosier, Guadaloupe, and began disembarking troops commanded by Victor Hugues, bearing the title of commissaire civil. After skirmishes with the British garrison and French royalists, in which Hugues’s troops were successful, a considerable force of vessels and men were sent by the British to dislodge them. The result was the withdrawal of the British from Grande-Terre the 3d July, just one month after Hugues’s arrival. In October the French received re-enforcements, took Basse-Terre, and the 6th October, 1794, were again masters of Guadaloupe, except a small port called Fort Matilda, which, so tenacious was the resistance, they did not capture until December 10. At the close of the preceding year the British had obtained possession of Oape Nicolas Mole, Jérémie, and other French villages in San Domingo, and in February, 1794, other places on the island fell into their hands after trifling resistance. In May a strong force was sent by the British against Port au Prince, which surrendered June 4. In December the British post at Cape Tiburion was attacked and captured by French troops, assisted by three armed vessels {ibid.). As soon as news of Hugues’s victory reached France there were dispatched to his assistance a 50-gun frigate, a 36-guu frigate, two corvettes, an armed ship or two, and eight or ten transports with 3,000 troops and suitable stores.
“The arrival of this important re-enforcement inspired Victor Hugues with designs against the other ceded islands. Having not only troops, but transports to convey and ships of war to protect them, this demon of republicanism, whose barbarity, as fully accredited on several occasions, was of the most revolting description, readily contrived to land soldiers at Sainte Lucie, St. Vincent, Grenada, and Dominique. Artful emissaries accompanied the troops, and soon succeeded in raising a ferment in the islands which they visited. The negroes, Caribs, and many of the old French inhabitants revolted; and *444 dreadful were the atrocities perpetrated upon the well affected * * * The British troops, thinly distributed from the first and since reduced by fatigue and sickness, could offer in general but a feeble resistance to the numbers of different enemies opposed to them. The garrison of Sainte Lucie, numbering 2,000 men, evacuated the island on the 19th of June” (1795). By the 27th of June the ‘ rebellion ’ in Dominique had been quelled “ by the few British troops stationed there, assisted by the bulk of the inhabitants,” St. Vincent and a part of Grenada remaining in a revolted state. {Ibid., 298 et seq.)
In April and May, 1790, the English took, without conflict, the Dutch settlements of Demerara, Essequibo, and Berbice. On the 24th May, after a stubborn combat of over a month, Sainte Lucie was captured by the British troops and vessels. June 11 St. Vincent surrendered, as a few days later did Grenada. So far as appears the French had no armed ships at either of these islands. In the preceding March the British made an unsuccessful attack upon the town and fort of Léogaue, San Domingo, and a successful one upon the fort and parish of Bombarde. No French ships appear in these actions, but a squadron arrived at Cape Frangois May 12, but returned immediately to France. (Ibid., 367 et seq.)
February, 1797, a British squadron left Port Boyal, Martinique, for the purpose of attacking the Spanish colonies. Trinidad soon fell into their hands, and, touching at Martinique on the way, the squadron proceeded to Porto Bico, the attack upon which was unsuccessful. In April the French 36-gun frigate Harmonie was destroyed by the English near Jean Babel, while sailing under orders to convoy to Cape Frangois, from Port au Prince and Jean Babel, a number of provision-laden' American vessels captured by French privateers. An action between three of the British fleet, a French privateer, and a French battery in Carcasse Bay, is the only other engagement noted as having taken place in the West Indies during this year. (Ibid., Vol. II, p. 97 et seq.)
The year 1798 opened with the evacuation by the British in April of Port au Prince, St. Marc, and Arcahaye, all in San Domingo, shortly after which three French 36-gun frigates landed supplies at Gape Frangois and returned home. An engagement between the British and Spanish was the only other important naval event of this year in the Gulf. In August, 1799, the British took the Dutch island of Surinam, finding in the *445 river a French, corvette, the Hussar, which was added to the British navy. (Ibid., p. 373.) September 13, 1800, the island of CuraQoa surrendered to the British, and forty-four vessels were found lying in the harbor, but no war ships. (Ibid., Vol. III, p. 59.)
In May, 1793, the Hyena, of 24 guns, and La Concorde, of 40 guns (the advance frigate of a French squadron of some six vessels), had an engagement off Cape Tiburion, which resulted in the defeat of the former. In July the English frigate Boston, after capturing the first lieutenant of the French frigate Bmbuscade, then lying in the harbor of New York, challenged the Frenchman to battle, a challenge which was accepted; the battle took place without decided result, and during it what was supposed to be a large French squadron appeared in the offing, while two French frigates were afterwards found by the Boston lying in the mouth of the Delaware, where she sought refuge. In November a combat took place between Penelope and Iphigenia on the one side and the Insurgente on the other, in the bight of Lóogane, island of San Domingo, resulting in the defeat of the French frigate. (Ibid., Vol. I, pp. 88 et seq.)
In December, 1794, the British frigate Blanche, cruising off the island of Désirade, a dependency of Guadeloupe, then in French possession, cut out a government armed schooner of 8 guns, which, to escape, had anchored in the bottom of the bay of Désirade. Later the Blanche had an encounter with the French 36-gun frigate Pique off Point-á-Pitre, in which, after a battle most gallant on both sides, the Pique was captured. In May there was a battle in Chesapeake Bay between two English frigates and five lightly armed Frenchmen, most of them store-ships. (Ibid., 277 et seq.)
On the 4th of May, 1796, the Spencer engaged and'captured the French gun-brig Vulcan in latitude 28° north, longitude 69° west.
In July, 1796, a combat without definite result took place between the frigates Aimable (English) and Pensée (French), beginning off “ Englishman’s Head,” Guadeloupe, while in August the Mermaid attacked the Vengeance within gun fire from Guadeloupe batteries, and in July the Quebec was chased by two French frigates when not far from Port au Prince.
August 25, 1796, the British 20-gun ship Edison engaged the Vengeance, the Mermaid?s former opponent, in latitude 41° 39' *446 north and longitude 66° 2-4' west, without definite result. Later in the same month an English squadron captured the French frigate Elizabeth off Cape Henry. In September the Médée engaged the Pelican off Guadeloupe. The action had no definite result, and it appears that at this time the Thetis (French) and either the Pensée or the Concorde were at anchor in Guadeloupe. The Pelican was so much inferior to the Médée in armament that Hugues sent an aid-de-camp under a flag of truce to the Saintes to inspect her as she lay there at anchor.
On the 10th August, 1797, the 38-gun British frigate Arethusa captured, after stern resistan ce, the French corvette Gaieté, sighting at about the same time the brig-corvette Espoir, of 14 guns, and a third vessel supposed to be a small French war vessel. Five days later the Alexandrian, schooner of 6 guns, acting as tender to the flag-ship at Martinique and engaged in quest of French privateers, captured a privateer schooner and chased another, which escaped. September 17 the Pelican destroyed the French privateer Trómpense off Cape St. Nicholas Mole. The 4th October the Alexandrian captured the French privateer Epicharis. January 3, 1798, the British armedsloop George, of 6 guns, while on a passage from Demerara to Martinique, was captured by two Spanish privateers. Thirteen days later boats from the 20-gun ship Babet, then cruising between Martinique and Dominique, captured the French armed schooner Besirée. April 17 the British schooner Recovery, cruising in the West Indies, fell in with the privateer Revanche and compelled her to surrender. May 7 the British brig sloop Victorieuse, while passing to leeward of Guadeloupe, was attacked without success by two French privateers. The same vessel during the following December, aided by the 14-gun brig-sloop Zephyr and some troops, after an attack upon the Spanish in the island of Margarita, took out the privateer Couleuvre, of 6 guns and 80 men, from the port of Gurupano. July 11 boats from the British 44-gun ship Regulus cut out three vessels at anchor in Aquada Bay, Porto Rico. December 11 the British 22-gun ship Perdrix captured the French privateer Armée Tit alie not far from St. Thomas.
March 30,1799, boats from the British frigate Trent and cutter Sparrow cut out a Spanish merchant ship and schooner which they found in a bay of Por.to Rico, at the same time storming and carrying a small Spanish battery. April 13, the *447 Amaranthe, a British 14-gun brig-sloop, captured the French letter-of-marque schooner Vengeur after the latter had made a noble resistance.
The officers and crew of the Abergavenny, stationary flagship at Port Boyal, tired of inaction during the whole of 1797 and part of 1798, fitted out on their own account a frigate launch which was so successful in prize-taking that its proprietors were enabled to purchase with their prize money a small schooner named the Ferret, which became the tender of the Abergavenny. The Ferret early in October, 1799, had a very sharp encounter with a Spanish privateer without decisive result. Later in the same month the British brig-sloop Echo cruising off Porto Rico, chased a French letter-of-marque into Laguadille bay and cut her out, and not long after occurred the daring capture of the Uermione in the harbor of Puerto Cabello. In November the Crescent and Calypso adroitly saved their convoy from a Spanish squadron. Still later in that month the Solebay cruising off San Domingo, encountered a French squadron recently arrived at Cape Francois from France and bound to Jacmel. Strange to say, this 32-gun frigate captured' all the French vessels without casualty on either side. The squadron consisted of four vessels mounting 58 guns, manned with 431 men, while the frigate carried 38 guns and about 212 men. In December an indecisive conflict took place off the island of Porto Santo between the Glenmore and Amiable in charge of an outward bound British West India convoy, and the A'Arene and Bergere bound from Rochelle to Cayenne with 450 troops and Victor Hugues on board. (James, Vol. II, pp. 79 etseq.; 198 etseq.; 313 etseq.) Early in April 1800 boats from the sloop Calypso off Cape Tiberion, carried the French privateer Diligente. In August the British 38-gun frigate Seine cruising in the Mona passage, sighted the Vengeance bound from Curaba to France, which after a sharp combat surrendered. In October the schooner Gypsie (British) cruising off Ouadaloupe, captured the Quidproquo of 8 guns. (James, Vol. III, pp. 27 et seq.*)
We have now set forth in this catalogue at somewhat tedious but necessary length every naval action (except some few unimportant combats with privateers) of which we can find rec *448 ord, which took place from 1793 to 1800, both years inclusive, between British and French or Spanish naval forces, on or near the eastern coast of America, between the latitude of Boston and the northern coast of South America. The reason for so voluminous a list, which, while probably not without omissions, we believe to be sufficiently correct, is that from it alone can any conclusion be drawn as to the amount of the French naval force and its uses during the period in dispute. For convenience to those whose interest or duty it may be to investigate this question we have cited but from one authority,, and one which, while not without fault of national prejudice, is carefully and conveniently .compiled. Other authorities examined by the court re-enforce the conclusions we draw from the citations already made.
Martinique it is alleged was effectively blockaded. This is not affirmatively shown, and perhaps we might rest here, but in this class of cases we have thought it right to go further and to endeavor to throw all the light in our power upon the exact situation.
From the citations made and also from the history of the American Navy certain facts clearly appear as worthy of notice.
First, the very small number of encounters between vessels of the English navy and French vessels of war.
Second, that no such encounter took place near Martinique, the two captures of privateers by the Alexandrian being the only combats mentioned as occurring in the vicinity of that port after its occupation by the English.
Third, that not a word is said, or an allusion made, in any attainable authority as to a blockade or an attempted blockade (in fact) of any West Indian English port. It does not appear that any armed vessel, English or American, was ordered to, or attempted to, break any such blockade although the English force was at times very large in the West Indies and was actively engaged. Neither in Cooper’s Naval History nor in the Life of Decatur, nor in any other work relating either to the English or American Navy which we have been able to consult, nor in the diplomatic correspondence of the period, do we find any statement tending to show that there existed anything other than a paper blockade, a blockade useless and void in so far as neutral rights were affected.
*449 Further proof of this absence of effective blockade is found in the large number of merchant vessels which safely traded with these ports during the period in question, and in the lack of contention on the part of France, notwithstanding Mr. Pickering’s vigorous language (Doc. 102, pp. 408, 410), that they were maintaining or endeavoring to maintain an effective blockade.
We have already seen that the French Government did not desire the fulñllmentof thetreaty’s guarantee, clause, deeming it wiseron their own accounttliatwe should not embark in the war. Genet and the colonists complained of our course on this subject, but the home government did not agree with them. As late as March, 1798, Talleyrand wrote to Pinckney and his colleagues that “ the Bepublic was hardly constituted when a minister was sent to Philadelphia, whose first act was to declare to the United States that they would not be pressed to execute the defensive clauses of the treaty of alliance, although the circumstance, in the least equivocal manner, exhibited the casus foederis” (4 Wait’s Am. State Papers, p. 97). Wefindno claim by France that the treaty was abrogated by a failure by the United States to fulfill the guarantee clause. During and soon after 1794the West India Islands fell into the hands of Great Britain, yet in 1793 (January 3) a French decree reciting the law of December, 1794, ordering the treaties of 1778 to be respected as in force, declared, in favor of the United States, the principle of free ships, free goods, except as to ports actually blockaded. As against this position of his superiors, Hugués, in February, 1797, issued his order subjecting to capture and confiscation vessels and cargoes destined to the captured islands, giving as a reason the failure of the guarantee.
The fact, then, that some of the West India islands had been taken from France does not seem to complicate the legal question.
It is urged that provisions bound for Martinique were properly condemned, on the ground, substantially, that as the port was in possession of an enemy force, it must be assumed they were intended to feed that force, and therefore were contraband by destination. (Citing The Peterhoof, 5 Wal., p. 58; 2 Black., 671 and 672, “The Prize Cases;” Desty on Shipping, § 423; Letens Droits. Recip., p. 114; Blatchford’s Prize Cases, p. 464.)
*450 As far back as Grotius the distinction was made between things useful only for war, the carriage of which by neutrals is prohibited, things which serve merely for pleasure, the carriage of which is permitted, and things useful both in peace and war, as money or provisions, which are sometimes lawful articles of neutral commerce, and sometimes not, according to the circumstances existing at the time. Thus provisions would be contraband if bound to a besieged camp or port. Kent, who seems to be the most liberal of the Avriters towards defendants’ position, thus lays down the rule:
“The modern established rule is, that provisions are not generally contraband, but may become so under circumstances arising out of the particular situation of the war, or the condition of the parties engaged in it. Among the circumstances which tend to preserve provisions from being liable to be treated as contraband, one is that they are the growth of the country which produces them. Another circumstance to which some indulgence is shown by the practice of nations is when the articles are in their native and manufactured state! Thus iron is treated with indulgence, though anchors and other in-strum ents fabricated out of it are directly contraband. Hem p is more favorably considered than cordage; and wheat is not considered as so objectionable a commodity, when going to an enemy’s country, as any of the final preparations of it for human use. The most important distinction is, whether the articles were intended for the ordinary use of life or even for mercantile ships’ use, or whether they were going with a highly probable destination to military use. The nature and quality of the port to which the articles are going is not an irrational test. If the port be a general commercial one, it is presumed the articles are going for civil use, though occasionally a ship of war may be constructed in that port. But if the great predominant character of that port, like Brest in France, or Portsmouth in England, be that of a port of military naval equipment it will be presumed that the articles were going for military use, although it is possible that the articles might have been applied to civil consumption. As it is impossible to ascertain positively the final use of an article aneipitis usus, it is not an injurious rule which deduces the final use from the immediate destination, and the presumption of a hostile use, founded on its destination to a military port, is very much inflamed, if, at the time when the articles were going, a considerable armament was notoriously preparing, to which a supply of those articles would be eminently useful.” (Vol. I, p. 139.)
The Supreme Court has decided that provisions the growth of the enemy’s country, but the property of a neutral, and car *451 ried in a neutral vessel, are good prize because destined to supply the enemy’s forces; and the court added that provisions are not generally contraband, but may become so because of their destination or the particular situation of the war. If intended for the ordinary use of life, they are innocent; if intended for the enemy’s forces or his ports of warlike equipment, then their seizure is justifiable. (The Comerceen, 1 Wheaton, 382).
Bluntschli thinks it against "gute sitie” to treat trade in provisions as contraband even if it serves the hostile army’s use Mod. Völkerrecht, § 807). Heffter (Europäisches Völkerrecht, 160) holds that belligerents may take measures against the export by neutrals of doubtful articles, articles occasionally contraband, only when a destination for the enemy’s Government and military forces can be shown on adequate grounds. Ortolan denies that provisions and objects of prime necessity may be considered contraband, except incases not pertinent tn this discussion (Vol. II, 179). Hautefeuille goes much further and admits as contraband only arms and munitions of war ready for immediate use, fit to be used as such and for no other purpose. (Droits des Nations Neutres, II, 419.)
Klüber leans the same way and holds that presumptions are in favor of freedom of trade (§ 288), and Martens states that the law in Europe prior to the first armed neutrality, 1780, considered as contraband only articles of direct use in war. Yattel sanctions the seizure of provisions "in certain junctures when we have hopes of reducing the enemy by famine” (Liv. III, ch. 7, sec. 112), but Wheaton believes he intended to carry the principle no further than to the case of a besieged city; and, commenting on Grotius, Wheaton reaches the conclusion that the latter sanctions the seizure of provisions, not bound to a port besieged or blockaded, only when made for preservation or defense under the pressure of that imperious and unequivocal necessity which breaks down the distinctions of property,” and this power should not be exercised until all other possible means have been used, then not if the right owner is under a like necessity, and even then restitution shall be made as soon as possible. Bynkershoek and Rutherfurth concur in this view. (Wheaton, pp. 556 to 558.)
Wheaton expresses no definite opinion for himself, but clearly leans to the side of freedom towards the neutral.
*452 In 1793 (May 7), Mr. Jefferson instructed Mr. Pinckney in relation to a fear expressed by the latter that the belligerent powers might stop our vessels going with grain to enemy ports, that “ such a stoppage to an unblockaded port would be so unequivocal an infringement of the neutral rights that we can not conceive it will be attempted.” This instruction was followed by another dated September 7,-1793, in which Mr. Jefferson,, after stating that in time of war neutrals are free to pursue their ordinary avocations of agriculture, manufacture, and commerce, with the exception of not furnishing to either belligerent “implements merely of war for the annoyance of the other, nor anything whatever to a place blockaded by its enemy,” proceeds to define these “implements” as follows:
“There does not exist perhaps a nation, in our common hemisphere, which has not made a particular enumeration of them in some or all of their treaties under the name of contraband. It suffices for the present occasion to say that corn, flour, and meal are not of the class of contraband, and consequently remain articles of free commerce. Acuitare which, like thatof the soil, gives employment to such a proportion of mankind, could never be suspended by the whole earth, or interrupted for them, whenever any two nations should think it proper to go to war. * * * If any nation whatever has a right to shut up to our produce all the ports of the earth except her own and those of her friends, she may shut up these also, and so confine us within our own limits. No nation can subscribe to such pretensions; no nation can agree, at the mere will or in terest of another, to have its peaceable industry suspended and its citizens reduced to idleness and want. * * * It is not enough for a nation to say we and our friends will buy yo^r produce. We have a right to answer that it suits us better to sell to their enemies as well as their friends. Our ships do not go to France to return empty. They go to exchange the surplus of one product which we can spare for surpluses of other kinds which they can spare and we want; which they can furnish on better terms aud more to our mind than G-reat Britain or her friends. We have a right to judge for ourselves what market best suits us, and they have none to forbid us the enjoyment of the necessaries and comforts which we may obtain from any other independent country.”
Mr. Randolph, denying that food can be universally ranked “ among military engines,” admitted that corn, meal, and flour are so in case of “ blockade, siege, or investment.” In the late Franco-Chinese war France endeavored to make “rice” con *453 traband, and referring to this contention Mr. Hasson, onr minister in Berlin, wrote as follows to the Secretary of State:
* * * “ But more especially I beg your attention to the importance of the principle involved in this declaration, as it concerns our American interests. We are neutrals in European wars. Food constitutes an immense portion of our exports. Every European war produces an increased demand for these supplies from neutral countries. The French doctrine declares them contraband, not only when destined directly for military ■consumption, but when going in the ordinary course of trade as food for the civil population of the belligerent government. If food can be thus excluded and captured, still more can clothing, the instruments of industry, and all less vital supplies be cut off on the ground that they tend to support the efforts of the belligerent nation. Indeed, the real principle involved goes to this extent, that everything the want of which will increase the distress of the civil population of the belligerent country may be declared contraband of war. The entire trade of neutrals with belligerents may thus be destroyed, irrespective of an effective blockade of ports. War itself would become more fatal to neutral States than to belligerent interests.
“ The rule of feudal times, the starvation of beleaguered and fortified towns, might be extended to an entire population of an open country. It is a return to barbaric habits of war. It might equally be claimed that all peaceful men of arms-bearing age could be deported, because otherwise they might be added to the military forces of the country.77
Martinique was nei ther blockaded nor besieged. It undoubtedly had a British garrison and was a refuge and sometimes a rendezvous for British armed vessels; at the same time it had a large civil population to be fed then, as it is now, largely by the products of the temperate zone. Its predominant character was not that of a port of naval or military equipment.
We do not consider that a provision-laden ship bound for Martinique was properly condemned on the- ground alone that she was bound to a British port, nor do we consider the fact that the port had once been French complicates the situation. There is nothing in the law of nations which justifies or makes valid as against neutrals such decrees as those issued during this war by the French and English. Russia admitted these decrees were contrary to the law of nations. France promised to pay for captures made under them. Ebgland and Spain did pay the United States. (See authorities cited in Gray, Adm'r, v. U. S., 21 C. Cls. R., p. 340.) If either party desired to *454 reduce the other by starvation there was a plain and acknowledged legal method to obtain that end; that is, by the establishment of an effective blockade. That neither was able to take this course, is not a reason that the commerce of neutrals should be suspended on the penalty of having their merchant vessels and cargoes confiscated. To admit such a doctrine would - be to impose in time of war a worse burden upon the neutral than that borne by either belligerent, and would shut it up in its own ports, or oblige it to furnish, in protection of its commerce, a naval force competent to compete with the belligerent, which by paper decrees unsupported by effective acts, by its municipal law attempts to interfere with the recognized and natural rights of neutral trade.
We do not understand that in the negotiations of 1800 the French denied the justice of claims similar in principle to the one now suggested, and the treaty of 1778 in terms conceded the right to trade with the enemy. The commerce of the United States was principally in agricultural products, certainly not in munitions of war. A most important complaint was as to that part of the belligerent decrees which directed seizure of neutral property on the sole ground of destination to an enemy port without regard to the character of the cargo. (See Treaty Commerce 1778, Articles XII, XIII, XXIII, XXIV.)
It seems to us clear that this class of claims was contemplated by the treaty of 1800 and the act of 1885.
The burden of proof in prize proceedings is on the seized vessel. The authorities concur in this general statement, but the principle is not technical and is not to be pushed beyond its proper natural intent. Seized vessels always appear before-the court under the taint of suspicion; that taint' it is incumbent upon them to remove, as it is in their power alone to do so. What the court looks for is the fact. If it appear that the vessel was innocently pursuing an honest and legal voyage, whether that aiipear by papers or otherwise, then the vessel should be released. No particular papers, no specified character of evidence is marked out and defined as indispensable to attain this end. A case is easily supposable in which a merchant vessel haá lost its papers by an accident, or by theft, or by robbery committed by a pirate or privateer, or through suppression by the captor, and it would not be admitted — the-fact of their non-production being explained, and the vessel’s *455 honest character being shown — that because some particular document was not on board she therefore should be condemned and confiscated. The onus probandi is on the captured vessel; which means no more than that she must explain away suspicious circumstances.
The learned counsel for the defense contend that the United States first violated the treaties of 1778 by the proclamation of neutrality of 1793, by refusing to guarantee the French possessions, by refusing to grant the promised harbor privileges,' and by concluding the Jay treaty. Therefore “ it was the right of France to retaliate upon the United States for these violations ; and whatever she did, or whatever was done by her authority in such retaliation prior to and during the limited war existing between the two countries, whether by captures, seizures, condemnations, or confiscations of American property, vessels or cargoes, was justifiably done.”
In another form substantially the same contention is made, defendants claiming that the acts of France complained of by the United States were authorized by the law of nations ,• that whether reparation was to be made by France depended upon compliance with her demands; that as the United States did not acquiesce in those demands, but by the annulling act of July, 1798, practically notified France that they would not do so, “from that moment France owed no compensation for those confiscations and the matter was res judicata.”
In considering these propositions it will strike any one who has studied the correspondence or will refer to the extracts made from it by us in this and our previous opinions on the spoliations question, that France never took this point. It will be remembered that the decrees at the outset were admitted by ail parties to be illegal, and excusable only on the ground of necessity$ that while this admission was not by any means consistently adhered to, still England and Spain came back to it in effect when they compensated the United States for losses— England through a commission organized under the provision of the Jay treaty, Spain in the treaties relative to the Florida purchase.
France did not seriously ask us to enforce the guarantee and apparently did not wish us to do so, however much we may have feared such a demand on her part, and however much some of her agents and her colonists may have desired it. The *456 /iyital point of difference was the Jay treaty. We have already discussed that instrument and stated that it was in conflict with the provisions in the Franco-American treaties of 1778. France | did not contend that the Jay treaty abrogated the treaties of 1778$ on the contrary, her whole argument, down to the ratification of the treaty of 1800, was based upon the premise that these treaties were of enduring force. The decree itself which ordered seizure of neutral property bound in United States vessels to enemy ports, set forth as a reason for its enactment that the Jay treaty modified, not annulled, the treaties with France, and that France was entitled under the treaties to any benefit this modification, might give her.
France did not deny at any point of the negotiations which led to the treaty of 1800 her liability for claims known by the generic name of “ spoliations,” but claimed in return for payment recognition of treaties, a demand which was not granted, and the contention remained embodied in the second article, which was stricken out. Thus was completed what Madison called the “ bargain” by which we released “ spolia-tions ” in consideration of release from all obligations founded upon the treaties of 1778. A strikin g illustration of the French position, if any is needed after the detailed statement of the negotiations which has heretofore been made, is found in Article IY of the treaty of 1800, which agrees to return prizes captured under the decrees, now termed by the defense decrees of retaliation, when those prizes had not been already definitively condemned.
Acts of retaliation are admitted to be justifiable under certain circumstances. They may exist when the two nations are otherwise at peace, but they are in their nature acts of warfare. They depart from the field of negotiation into that of force, and, as is war, are justified by a successful result. To term the decrees of France and the acts of their privateers under them “ acts of reprisal” does not alter the facts or the legal position. That position has been defined by the Supreme Court of the United States as limited partial war. We, following the path indicated by that tribunal, have defined it as “limited war in its nature similar to a prolonged series of reprisals.” The result of that partial limited war, the 'result of the negotiations for settlement, the agreement reached by the two parties which made the Government of the United States liable *457 over to its citizens, we have heretofore considered so much in detail that we shall not now repeat it, and we need only state briefly the result heretofore reached by us, and in which we, after re-examination, are confirmed, that the acts of France, now in question, whether called- “reprisals” or acts of limited warfare, were contended by the United States to be illegal, were admitted so to be by France; that France stood ready to make the compensation made by England and Spain for similar acts on their part, provided we would admit certain claims of her own, which we declined to do; and finally, by the substitution of the existing second article of the treaty for that agreed upon by the negotiators, these claims were surrendered in consideration of a release from the French demand.
The case of the Two Brothers presents a claim for salvage paid an American man-of-war for rescue from a French privateer.
The broad principle of prize law forbids an allowance by way of salvage to the captor of a neutral in possession of a belligerent. The reason of the rule is plain: salvage is remuneration for aid in case of danger, and a neutral vessel in the hands of a civilized belligerent is not in danger, for it is to be presumed that, if innocent, she will be discharged by the prize-court with damages for detention. Some of the prize courts in France were at certain times during the disturbed period between 1792 and 1801 very fair and just in their treatment of neutral property. We ha ve in our opinions on the spoliations cited instances of a reasonable j udicial application of the law. Unfortunately, however, the fair administration of justice, which before the Revolution and since has characterized the learned and able officials who have there filled the offices of the magistra-ture, was interrupted during the period now under consideration. Setting aside the charges made of ulterior and improper motives on the part of individual magistrates of which illustrations are found in the letters of Monroe, Mountflorence, and Pickering [supra), we need only recall that the decrees of the French or colonial governments were binding upon the prize tribunals, and those tribunals were obliged to enforce them. Many of the decrees were in conflict with-the law of nations and were an invasion of the rights of neutrals. The position assumed by the French authorities placed neutrals prosecuting innocent voyages in a most dangerous position. If taken *458 by a French privateer they were not to expect a trial under the recognized law of nations, but a trial under arbitrary and illegal municipal enactments; a trial which would necessarily result in condemnation, even if the local tribunal were above suspicion of improper prejudice.
Under these circumstances the reason fails for the rule as to salvage in case of recapture of a neutral from a belligerent. As the neutral was in danger of condemnation, so the recapturing vessel was entitled to salvage. We have already cited the opinion of Lord Stowell, who, at the time o f the occurrences from which these claims arose, found it just and necessary to adopt this rule.
The Supreme Court of the United States have declared that to support a demand for salvage two circumstances must concur — the taking must be lawful, and there must be a meritorious service rendered to the recaptured. Commenting on Lord Stowell’s opinion as to the necessity for meritorious service the court say:
“The principle is that without benefit salvage is not payable; and it is merely a consequence from this principle which exempts recaptured neutrals from its payment. But let a nation change its laws and its practice on this subject; let its legislation be such as to subject to condemnation all neutrals captured by its cruisers, and who will say that no benefit is conferred by a recapture. In such a course of things the state of the neutral is completely changed. So far from being safe, he is in as much danger of condemnation as if captured by his own declared enemy. A series, of decisions, then, and of rules founded on his supposed safety, no longer apply. Only those rules are applicable which regulate a situation of actual danger. This is not as it has been termed, a change of principle, but a preservation of principle by a practical application of it according to the original substantial good sense of the rule.”
The court then inquire whether the laws of France were such as to have rendered the condemnation of a neutral in possession of a French prize crew so probable as to create a case of such real danger that her recapture must be considered as a meritorious service authorizing allowance as salvage. On this point the conclusion is reached that the danger of loss was real and imminent.
“ The captured vessel was of such description that the law by which she was to be tried condemned her as good prize to the captor. Her danger then was real and imminent. The *459 service rendered her was an essential service, and. the court is therefore of opinion that the recaptor is entitled to salvage.” (Talbot v. Seeman, case of the Amelia, 1 Cr., p. 1.)
We see no reason why a rule laid down by such eminent authority, so just in principle, and the result of such sound judicial reasoning, should not be applied to the cases now before us.
The Nancy was under charter to sail from Baltimore to Jamaica, there to discharge cargo, reload, and return to Baltimore. While oh her way to Jamaica under this charterqmrty she was seized on the high seas by a French privateer and lost to her owners. The question is now presented as to the basis upon which an allowance for freight should be computed.
It is evident that freight earned is an element of value in the property lost. The ship-owner has a right to expect a reasonable return upon his venture, and this return he finds only in the freight money. As between the vessel and the cargo-owner the freight is regarded as an entirety due in no part until the arrival of the vessel at the port of destination. Between these two alone does this rule prevail — as to them the law has placed a certain construction upon the contract of af-freightment to which they are parties — a construction well understood, admitted, and certain. As to third parties no such rule prevails, and as against them freight is often recoverable, even when the vessel does not reach her destination. In cases of tort, such as collision, Dr. Lushington says : “ The party who had suffered the injury is clearly entitled to an adequate compensation for any loss lie may sustain for the detention of the vessel during the period which is necessary for the completion of the repairs, and furnishing the new articles (2 W. Bobin-son, 279), and he allowed gross freight, less the ordinary ship’s expenses necessary to earn it. As a broad rule this is well enough, but it is not without possible .exception, for we may imagine an injury at a time when the vessel is not engaged in freight earning, although even then we probably look to the market for a proper measure of damages.
The case of The Amiable Nancy (3 Wheaton, 560), and Smith v. Condry (1 How., 35), allowed only the “ actual damage sustained by the party at the time and place of injury” without allowance for detention. In Williamion v. Barrett (13 Howard, 101), a collision case, the court allowed damages for demur- *460 rage, adopting the rate of freight, less expenses, as a proper measure, three justices dissenting on the ground that the majority rule introduced too much uncertainty into the case and tended to increase the “stringency, tediousness, and charges of litigation in collision cases.” They therefore preferred a rule granting full damages at the time and place of collision, with legal interest on the amount thus ascertained.
The case of the Baltimore, arising from collision, was decided in 1869 (8 Wall., 377), the court holding that the suffering party is not limited to compensation for the immediate effects of the injury inflicted, but the claim for compensation may extend to loss of freight, necessary expense incurred in making repairs, and unavoidable detention. Restitutio in integram is the leading maxim in such cases, say the court, and in respect to materials for repairs where repairs are practicable there shall not, as in insurance cases, be any deduction for new materials in place of old, for this reason that “ the claim of the injured party arises by reason of the wrongful act of the party by whom the damage was occasioned, and the measure of the indemnity is not limited by any contract, but is coextensive with the amount of damage. * * * Allowance for freight is made in such a case reckoning the gross freight less the charges which would necessarily have been incurred in earning the same, and which were saved to the owner by the accident, together with interest on the same from the date of the probable termination of the voyage.”
In case of capture the general rule is that the neutral carrier of enemy’s property is entitled to his freight (Story, J., in the Comerceen, 1 Gallison, 264.) Sir William Scott held very firmly by this rule in the case of Der Mohr (3 C. Rob., 129, and 4 C. Rob., 315), a case of great hardship, appealing strongly to the sympathy of the court. In that case he said:
“In an unfortunate case like the present, the court would certainly be disposed to give the captor all possible relief. I need not add that no relief is possible which can not be given consistently with the justice due to the claimant. The demand of freight is, I apprehend, an absolute demand, in cases where the ship is pronounced to be innocently employed. * * * The freight is as much a part of the loss as the ship, for he (the captor) was bound to answer equally for both. The captor has, by taking possession of the whole cargo, deprived the claimant of the fund to which his security was fixed. He was *461 bound to bring in that cargo subject to the demand for freight. He was just as answerable for the freight of the voyage as for the ship which was to earn it, or which was rather to be considered as having already earned it. In the room of this fund the captor has substituted his own piersonal responsibility, for loss accrues by the fault of his agent. I see no distinction under which I can pronounce that the claimant is not as much entitled to the freight as to the vessel.” (See also 1 Gallison, 274, the Anna Green.)
Upon an open insurance policy gross freight is recoverable (2 Phillips Ins., § 1238). As to insurance, the inchoate right to freight vests directly “ the ship has broken ground on the voyage described in the charter-party,” and there is an insurable interest “ where there is an expectancy coupled with a present existing title” (Lucena v. Crawford, 2 Bos. and Pull. N. R., 269; 1 Phillips Ins., § 334, p. 192).
Freight, then, is property insurable and collectible. It has value although the right as against the freighter may be inchoate until delivery. As to the freighter the ship-owner is without redress, unless there be delivery in accordance with the con tract, but as to an insurer or a tort-feasor, there is a right to redress upon the happening of an interruption of the voyage. The amount of that redress and the method of computing it in the cases now submitted to us of illegal capture are now to be decided. The ship-owner has a right to a reasonable return ' upon his investment, for the risk to which his property is subjected, for its depreciation while engaged in the undertaking, and for the expenses to which he is subjected in carrying it out. The measure of that return, based upon the theory of a comr pleted voyage, he has himself fixed in his contract of affreightment. If his voyage be not completed, but be interrupted and his property lost by the act of a wrong-doer, then, as against that wrong-doer, the maxim restitutio in integrum applies. If the voyage were completed the difficulty would not be serious, for as a guide we should have a contract made by parties opposed in interest and familiar with the business. As the voyage has not been completed, an allowance of gross freight would be more than á restitutio in integrum, and would neglect a deduction for expenses necessarily to be incurred in completing the contract and in conveying the cargo to the point of delivery. To allow gross freight under these circumstances would in effect not merely reimburse the owner, but render the seizure a mat *462 ter of profit to him, and we do not understand that punitive damages should be recovered in the cases now before us. The vessel having been destroyed before the completion of the voyage, has not been so long employed as the contract contemplated, her crew have received less wages, and her hull and outfit have received less deterioration. She has only earned freight pro tanto. On the other hand, the expenses of freight earning are much greater at the beginning of the voyage than at any other period, for then advances are made seamen, stores are shipped, port charges and the cost of loading have to be met. Therefore, to divide the total freight by the number of days out of port would not be fair to the ship-owner; to deduct from the total freight the cost of the Amyage from the place of destruction to port of destination would be a fairer rule, could those expenses be ascertained.
To compute the amount of this freight in each instance is practically impossible, so that the court is forced to the adoption of some general rule which in our opinion is fair in result. The difficulty is not a novel one, and the method of solution not without precedent. Those familiar with the proceedings of prize courts know that a substantially arbitrary rule is there often adopted in practice to enforce justice, and now, nearly a hundred years after the events from which these claims arise, when all, witnesses are dead and many records destroyed, we are forced to this course, as it is evidently impossible to estimate in every instance precisely the proportion of freight earned. Where such an estimate can be made we shall make it, in other cases we shall adopt'a general rule.
In seeking for such a rule, we learn that in commercial cities, in the adjustment of average losses, there is a practice to award arbitrarily two-thirds of the full freight on the immediate voyage. This course was in effect followed by the commissioners under the treaty of 1831 with France, who made .a similar allowance as a fair measure of the increase in value of the cargo by reason of the distance to which it had been transported at the time of capture; and the award Avas made to the shipper if he had paid freight; to the ship-owner if the freight had not been paid.
After carefully examining the cases before us we conclude that this rule is substantially just, and we adopt it.
*463 This brings us to another point. The Nancy was under charter for a round voyage — Baltimore to Jamaica and return. She was destroyed on the outward voyage. Is she entitled to an allowance for freight based upon the entire contract contained in the charter-party ?
As against an insurer or tort-feasor the inchoate right to freight vests when the vessel breaks ground “ on the voyage described in the charter-party” (supra). An insurable interest in freight cannot spring from a mere “ expectancy,” but may spring from an “expectancy” when this is coupled with “ a present existing title.” (Lucena v. Crawford, supra.)
In cases of general average for jettison, Lowndes states the rule to be that “ when a ship is chartered to fetch or carry a cargo belonging to the charterer, the freight under the charter must contribute to the general average, whether or not the cargo is on board the ship at the time of the general average act, since the loss of the chartered ship, whether laden or hot, would deprive the ship-owner of his expected freight.” {Lowndes on General Average, 236.)
It has been held in this country that where a gross sum was to be paid as freight for a voyage out and return, the principal object of the voyage being to obtain a return cargo, the freight for the whole trip must contribute to general average on the outward voyage. (The Mary, 1 Sprague’s Decisions, 17.) The same rule has been adopted in cases of salvage. (The Nathanial Hooper, 3 Sumner, 542; The Progress, Edwards, 210; The Dorothy Foster, 6 C. Rob., 88; see also Livingston vs. Columbia Insurance Company, 3 Johns, N. Y., 49; Hart vs. Delaware Insurance Company, 2 Wash., C. C., 346.)
The decisions on this question in the United States do not go so far as those in England, but we lean to the doctrine of Sir William Scott and Dr. Lushington, as better applicable to the cases now before us, that when a vessel is actually under contract for a voyage from one port to another, thence to proceed to a third, she has such “ a present existing title” in the freight money of the entire voyage as to authorize a recovery based upon the total freight money for the round trip.
Of course she is not entitled to gross freight, and we must not be understood as intending any application ofthis principle to a vessel proceeding under a mere “expectancy” of finding cargo at her first port of call. The principle only covers those *464 cases where there is an assurance of freight from her first port of call to her second, and a price stipulated to be paid therefor.
We have discussed and ruled upon as many of the general questions submitted in the argument as it seems to us wise now to decide, either for counsels’ convenience or in justice to the Government or the claimants. Other points which have arisen in the long argument we shall consider as they are brought before us in specific cases. The object of obtaining from the court a ruling upon general principles is in our opinion now sufficiently attained.'
We file herewith, that they may be reported to Congress, our conclusions of fact and law in many cases. This opinion, with those already delivered, contain the conclusions which in our judgment affect the liability of the United States therefor.

Consult also Life of Decatur, Sparks’ series of Biography, 31; Cooper’s. Naval History United States, Vol. I.)