Nott, Ch. J.,
delivered the opinion of the court:
On the 28th of November, 1798; the American ship Concord sailed from Canton bound for Philadelphia.
On the 6th of February, 1799, she was stopped on the high *442 seas by the French frigate La-Prudente. The captain of the frigate found nothing in the ship’s papers to justify detention, and accordingly allowed her to proceed. But upon further reflection, after an interval of several hours, he reconsidered his determination and resolved to take the responsibility of seizing the Concord and of sending her in to the Isle of France for a further examination bjr the authorities.
The story of her seizure is best told by her captain in his protest:
“She proved to be the French frigate or corsair La Prudente, Cap. Joliffi, from the Isle of France, on a cruise, who, after strictly examining my ship’s papers, bills of lading, &c., ordered his interpreter to inform me it was not in his power to detain me, as my papers showed the ship and cargo to be neutral property; at same time returned me my papers with orders to proceed on my voyage. Accordingly 1 returned on board the Concord; at 2 p. m. made sail' on our course, the frigate doing the same, but standing about two points more north; at half past 3 p. m. hoisted colors on board the frigate; we hoisted ours also; the frigate came up; the captain ordered us to heave to until he sent his boat on board, which came with three officers, and orders for me or the supercargo to repair on board the Prudente, with all letters, papers, invoices, &c., relating to ship or cargo. Accordingly Mr. Dobell, supercargo of the Concord, took the papers and went on board the frigate. Soon after the boat returned for Mr. Dobell’s desk and small box, containing sundry orders, invoices, &c., respecting the outward cargo. The 2d officer and 2d boy were also taken on board with Mr. Dobell, and all detained during the night. At 8 p. m. the frigate hailed and ordered the officers to make sail after her, and steer W. b. N. during the night. At 6 a. m. the frigate’s boat came for me. I went on board. The captain demanded my former bills of lading for outward cargo, for which I went on board the Concord and returned again on board the frigate. After a long and tedious examination of all trivial papers the captain determined to send us to the Isle of France. At 4 p. m. on the eight began to shift crews. Cap. Joliff took my chief mate, seventeen of the Concord’s crew on board the frigate, sent some Frenchmen on board, sealed up all the Concord’s papers, and dispatched us with prize master for the Isle of France, where we arrived on the 10th day of March, as aforesaid.”
On a subsequent day the prize court in the Isle of France rendered a decree “confiscating” the ship and cargo. The decree recites that the ship Concord sailed under the Ameri *443 can flag and an American passport; that the captain, officers, and crew were all subjects of that nation, and that her cargo belonged to American subjects residing in Philadelphia. In other words, the Concord was one of the very few of the American vessels whose conduct, ownership, and the character of whose cargo were, in the opinion of French tribunals, each and all absolutely unexceptionable. <
Nevertheless, the tribunal pronounced a decree of confiscation (not condemnation) upon the sole ground that the Governor-General of the Isle of Franco'had on the 23d day of June, 1799, published a proclamation declaring that France and the United States were and had been in a state of hostility from the 9th day of July, 1798, and requiring all tribunals to confiscate all American vessels which had been or should bo brought into French ports, with the cargoes on board.
The distinction between “confiscated” and “condemned” rested on certain French decrees. If a vessel was sailing under a neutral flag, she or her cargo might be condemed for cause; if she were an enemy, she and her cargo would thereby be liable to confiscation. -
It is apparent that some unfortunate American vessel whose master carried a commission under the Act 9th Juiy, 1798 (1 Stat. L., 578), had fallen into the hands of the French governor, and that he had thereupon, without instructions from his own Government, proclaimed war as existing between the two countries. It is a general principle that while a nation is enjoying the advantages of peace she must be held to the obligations of peace and be responsible, among other things, for the acts of her officers and agents, but that when war comes and those responsibilities cease, she, while encountering the pains and penalties of war, may exercise the belligerent right of capture. At various times between 1793 and 1800 there was much which looked like war between the two countries. But notwithstanding the act of the' 9th of July, 1798, and the decision of the Supreme Court in Bass v. Tingy (4 Dall. R., 37), and the historic battle of the Constellation with La Vengeance, wherein each ship nearly destroyed the other and the French frigate came into Curapoa dismasted and sinking, with 50 killed and 110 wounded, it has been held, and it must be held again, that no war existed which released France from *444 bcr international responsibilities, or which authorized her to destroy American commerce. The question has been exhaustively argued and exhaustively examined, and all the information and learning which it is susceptible of receiving-will be found embodied in the opinions in the cases of Gray (21 C. Cls. R.., 340), Cushing (22 id., 1), and the John (22 id., 408). In a few words it may be said that the United States never ceased to hold France pecuniarily responsible for the acts of her cruisers and privateers, and that France never denied her liability for unjustifiable seizures and condemnations. Moreover, France never interposed the defense of belligerent rights, but, on the contrary, again and again reiterated hex-willingness to discharge her treaty and international obligations whenever the United States would discharge theirs. A defense which France could not now and did not then set up, the United States can not set up. Where France claimed no exemption the United States can claim none for her; where they can- claim no exemption for France, they can set up none for themselves. The question of liability to be determined is the liability of France.
Another fact to be considered is that this warfare, such as it was, existed only in what were then remote parts of the earth, the West India Islands, the Straits of Sun da, the Chinese Seas, etc. At the time when the governor of the Isle of France was proclaiming war and confiscating- American vessels for no fault of their own, the Tribunal of Commerce in Bayonne, in the immediate presence of the French Grovernment, was proceeding upon the basis of peace, and administering justice according to the accepted principles of international law, except, of course, where those principles were varied by French decrees. Thus in the case of the ship Victory, Hatton, master (not reported), captured October 6, 1799, while on her voyage from Norfolk to London, the tribunal held that some of the property on board, being English, was subject to capture; that, inasmuch as the captors “could not, while at sea, take out the goods which were enemy’s property found on the ship, they were authorized to bring the ship into a port for its discharge;” that hence there was no reason for decreeing damages to the American ship. But the court then decrees “the surrender to Captain Hatton of *445 the said ship Victory with her rigging, apparel, appurtenances, and dependencies, to be restored to him in the condition she was at the time of the seizure; also that like surrender shall be made to him of the papers and documents relative to said ship, and, finally, the surrender of the portions of the goods which were not British propertj'-.” And the court then proceeds to decree the condemnation of the English property found on the ship, with the proviso “that they, the captors, pa}»- the freight thereon to the said Captain Hatton, stipulated and borne in the bills of lading’ which will be reduced to French monej'' according to French exchange on Hamburg and that of Hamburg on London by persons skilled and upon whom the parties shall agree or, in default of agreeing, by persons named by the court.”
This certainly was all that any neutral could ask.
Again, and at about the same time, in the case of the ship Fame, Bust, master, the same tribunal considered the very point now under consideration, and its decision was all that this Government could demand:
“Considering the point relative to the letter of marque of which the ship was the bearer. That the French Government without doubt is not ignorant of the delivery of like letters by the Government of the United States to the vessels of the said United States nor of the terms in which these letters are conceived. That now and up to the present time it has not been manifested that it regarded this circumstance and the act of Congress of the United States of the month of July, TT98, either as a declaration of war or as hostilities against France, since it has not asked of the legislative body a law declaring the French nation to be in a state of war with the United States of North America. That a state of war can not be established or declared without a law of the legislative body. That it does not belong to the tribunals to take notice of any step that a foreign power may take as constituting a state of war between France and itself.
“That'the condemnation demanded of the said ship Fame and of her cargo, because of the said letter of marque, can not be founded upon any law, and can not and ought not to be pronounced. The said ship besides, not having opposed any resistance, suffered itself to be visited at the summons which was made to it by the said privateer. There is, then, no occasion to accede to the demand of the captors upon this point.”
*446 This case was appealed to the civil tribunal of the department, and thence to the Council of Prizes, which latter tribunal, on the 13th December, .1800, released the vessel and cargo, in accordance with the judgment of the two lower tribunals. (Schooner John, Blackler, master, 22 C. Cls. R., 408.)
The counsel for the United States has argued with great ingenuity and learning that these decress were rendered at the time when the treaty of September 30, 1800, was a matter of negotiation; that the French Government then desired to retain America as a friend and not to drive her over to the enemies of France, who then numbered nearly all of the sov-ereignties of Europe; and that France in effect waived her legal and maritime rights so that she might smooth the way to an adjustment of all differences with the American Government. This might be so held if it. were a defense which the United States could properly set up — if the question of liability were not always the question, “What was the liability of France before the claims were relinquished to her?” It seems undeniable that if this court were an international tribunal and France were an actual defendant in court, no one would think it possible for her to say to-day what she did not say through her own tribunals just one hundred years ago, when the matter was in litigation and the rights of the American owners a matter of contemporaneous adjudication. Accordingly it must be held now, as it has been held before, that there was no war which accorded'to France general belliger-ant rights or which subjected an American vessel to capture and condemnation if she were at the time without fault.
It is to be noted in this case that the Concord was not subject to condemnation or confiscation because of any act or paper of her own. She did not resist search; she did not attempt flight; no objection was raised by the French tribunal to any want of papers or to the character of any paper which she carried. The decree narrates that she had an American passport; but commissions under the act of July 9,1198, were generally styled by the French tribunals letters of marque. She does not appear to have had any armament whatever, and her crew, as far as appears, consisted of only 18 men. The question, therefore, whether the carrying of a commission under the act of July 9, 1798, was evidence of aggressive *447 intent which would render her liable to capture and condemnation is not presented by the evidence in this case.
The counsel for the Government has filed a motion to reopen some of the cases against this vessel so as to enable the defendants to plead an indebtednéss on the part of the original claimants to the United States. Such a cross demand is not strictly a set-off, inasmuch as the court does not render judgments in these cases, but nevertheless it is an equity which Congress may properly consider in cases where the relief to be afforded by- Congress is a matter of conscience and equity. (Ship Parkman, present term.)
All of these motions, with one exception, have been withdrawn or abandoned.
In the case of Peter Blight, No. 1589, it is found that $1,752.32 became due to the United States on a custom-house bond, and there is no evidence to establish payment. Whether this apparent indebtedness of Peter Blight, the original claimant, should be deducted from the award in favor of his administrator is a question resting exclusively in the discretion of Congress, and in regard to it the court reports no conclusion and expresses no opinion.
The order of the court is that the findings and conclusions now filed be reported to Congress, together with a copy of this opinion.