Weldon,‘J.,
delivered the opinion of the court:
The schooner Betsey and Polly (Cottle, master) sailed on a commercial voyage on the 18th day of December, 1797, from Boston, bound to Martinico, but cleared for Guadeloupe. While pursuing said voyage she was seized on the high seas on the 10th day of January, 1798, by the French privateer Petit Coureur, Captain Lacour; carried to the island of Guadeloupe, and on the 22d of said last-mentioned month both vessel and cargo were condemned and ordered sold for the benefit of the captain by the French prize court sitting at Basse Terre; because of said condemnation and sale the vessel and cargo became a total loss to the owners.
The grounds of condemnation as set forth in the decree are as follows:
“First. That the clearance for Guadeloupe was a deception; that the vessel was bound for Martinico.
“Second. That national vessels and French privateers are authorized to capture and bring into ports of the Republic all neutral vessels whose destination is to any of the Windward Islands or Leeward Islands of America, delivered to the English, occupied and defended by emigrants.”
It is insisted on the part of the defendants that because of the false destination of the vessel the condemnation was not illegal; and therefore the claimants have no right to a finding of illegality in the proceedings of the prize court.
The.clearance shows that the vessel sailed for Guadaloupe, but the findings show that the real destination was for the island of Martinique, which lies nearly 100 miles south of Guadaloupe, and to that extent beyond the course of sailing' from the port of Boston and the port of Guadaloupe.
At the time of the seizure the island of Martinique was in the possession of the British, the same having been wrested from the French in .1794, though restored in 1802. The island of Guadaloupe was a French island fully in the possession of the French. It was because of that condition of the .two islands that it was important to both the English and the French whether a neutral vessel was sailing to Martinique or Guadaloupe. If it was sailing to Martinique, it was wholly immaterial to the English wThat cargo it had on board; but to the French it might have been important, as *35 the voyage of the vessel dependent upon the character of the cargo might be in violation of the belligerent rights of France. If the vessel had been visited by a French man of war or privateer before it reached Guadaloupe, as it might have boon, and it had been ascertained, as it would have been, that the ship was bound for a friendly island, it would have been the duty of the French vessel to have permitted it to pass without further molestation; but if the real destination of the ship had been disclosed by the clearance of the vessel, then the belligerent rights of the French would have attached to the vessel, and it would have been subjected to visitation and search in accordance with the rules of international law.
The condition of the ship with respect to its clearance and the actual purpose of a voyage to Martinique by the captain of the vessel was a deception upon the part of the captain of the vessel, but was it a wrong upon the rights of France ? The question of law which the court has to determine is, What is the legal effect of such deception? Among the many questions ot international and prize .law which have been raised in the different phases of contention incident to the spoliation litigation in this court, the exact question raised by the record in this proceeding has not been presented, so that we shall have to deal with it as a new one.
The destination of a vessel on the high seas in time of war may be very important; and the law requires the utmost good faith and truthfulness on the part of the neutral vessel to disclose its true destination -when it is material. If a vessel is sailing to a port of the belligerent attempting to exercise the right of visitation and search, every question of liability is eliminated from the transaction; if it is sailing to a port of its adversary, then every question of good faith and fairness arises.
Nothing is shown in the findings tending to excuse or explain why the destination which the vessel reached and the one set forth in the clearance was so different; and in the absence of such a showing’ it is the duty of the court to assume that it was the result of purpose and design' in derogation of the rights of the French.
In the case of The Franklin (3 Rob., 217), in the English *36 High Court of Admiralty, it was held that contraband with false destination affects the ship as well as the cargo.
That was the case of a Prussian ship loaded with a cargo of hemp and iron from Lubeek ostensibly to Lisbon, but actually, as it was inferred by the court, from the place of the capture and course of the voyage, to Bilboa, a Spanish port.
The court says:
“The destination therefore is the principal fact in the case. The issue, in fact, was as to whether the place of the capture indicated a false destination, and the court came to the con elusion that the ship was so far out of the wajr of a proper course between Lubeek and Lisbon that it must be presumed that the voj7age was not intended to be between Lubeek and Lisbon, but must have been intended as.a voyage from Lubeek to Bilboa, in Spain. Much stress is laid on the fact that the master did not explain why ho was found so far out of his course, and it was therefore assumed that Bilboa was the port of destination in the inception of the voyage instead of Lisbon.”
, Sir William Scott, in the opinion of the court, also says:
“The consequence will be, this fraudulent conduct on the part of those concerned in the ship will justly subject her to confiscation. Anciently the carrying of contraband did not in ordinary cases affect the ship, and although a relaxation has taken place, it is a relaxation the benefit of which can only be claimed in fair cases. The aggravation of fraud justifies additional penalties, and the right of presumption which otherwise would be defeated must be secured by them. * * * I have deliberated upon this case and desire it to be considered as the settled rule of law reached by this court, that the cariying of contraband with a false destination will work a condemnation of the ship’ as well as the cargo.
“In the earlier case of The Sarah Christina (1 C. Rob., 237) the court, from a favorable regard to some particular circumstances, practiced an indulgence in restoring the ship, but without freight and expenses, declaring it at the time to be an indulgence hardly reconcilable to just principle. Having now maturely and upon discussion considered the general point, I am decidedly of opinion that confiscation of the vessel is the legal result of the carriage of contraband under a false destination.”
The vessel in this case, belonged to Josiah Knapp, a citizen of the United States, and the cargo, consisting of codfish, ship bread, lumber, staves, shooks, and hoops, belonged to the owners, George Williams & Co., and William Cottle, the *37 master. No part of the cargo was contraband of war, and in that particular differs from the cargo of the vessel in the case of Franklin (supra).
If it had been shown that at the time of the capture the vessel had on board articles contraband of war, the cases would be analogous and the law would by that decision be clear against the rights of the claimants. The transaction upon the part of the officer of the ship was a deception and an abstract fraud on the belligerent rights of France. But did such deception and fraud impair the rights of the captors ? The schooner had a perfect right to sail from Boston to any port of the West Indies in the possession and control of the enemies of France, and not in a state of blockade, with an innocent cargo; and being a neutral vessel with such a cargo it was wholty immaterial to France what its destination was. If the ship had been intercepted by the French vessel before it reached Gruadaloupe, it could not have lawfully been seized.
It was also condemned because it was sailing to the Windward Islands in violation of the rights of France dependent upon some regulation or ordinance of France contrary to the principles of the treaties which at the time of the capture measured and determined the rights and obligations of the United States and France.
The material question in this case is as to the legal effect of the contradiction between the real destination, Martinico, and the apparent destination of Guadaloupe. The asserted destination was a falsehood; but did it affect the rights of the captors? In morals it was wrong to have one destination apparentl}” and another in fact; but it is not every untruth which the law intends to punish. If the enunciation of the falsehood is wholl3r immaterial to the rights and interest of others, the law does not undertake to punish the offender. That is left to the domain of morals. The law has for its basis the tangible result of damage, and upon that result founds its jurisdiction and control of the actions of men. The distinction between the untruth with which the law deals and the untruth of the highest morality is most accurately stated by Vattel (p. 372):
“From this subject arises the question which has been warmly debated in former days and which appeared not a lit- *38 tie.intricate at a time when people did not entertain just or accurate ideas respecting the nature of a lAe. Several writers, and especially divines, have made truth a kind of deit3>' which, for its own sake and independently of its consequences, we owe a certain inviolable respect. They have absolutely condemned every speech that is contrary to the speaker’s thoughts. They have pronounced it to be our dutjr on every occasion when we can not-be silent to speak the truth according to the best of our knowledge, and to sacrifice to their diving our dearest interests rather than be deficient in respect to her. But philalethists of more accurate ideas and more profound penetration, have cleared up that notion, so confused and so false in its consequences. They have acknowledged that truth in general is to be respected, as being the soul of human society, the basis of all confidence in the mutual intercourse of men, and consequently that a man ought not to speak an untruth even in matters of indifference, lest he weaken the respect due to truth in general and injure himself by rendering his veracity questionable even when he speaks seriousljn But in thus grounding the respect due to truth on its effects they took the right road, and soon found it easy to distinguish between the occasions when we are obliged to speak the truth, or declare our thoughts, and those when there exists.no such obligation.”
The law does not deal, in the adjustment of the legal rights of parties, with what may be called abstract facts, but only with such facts as may, in the given case, affect the legal rights of the parties litigant. The ship, in its relation to the bellgerent rights of France, was perfectly harmless, it had no contraband on board, was a neutral vessel, equipped with all the indicia of neutrality and ownership; so that, between the ports of Guadaloupe and Martinique, it was not liable to seizure by the French vessel; the false destination did not change or affect the rights of France, and without some effect upon' such rights France would have no right to complain.
The American ship at the time of the seizure had passed the port of alleged destination, it is true, but its neutral character, freedom from contraband, and real destination to a neutral port gave it the right to pursue its vojmg'e. The rights of commerce are more important than the rights of belligerents, and should not be interrupted and impaired for light and trivial causes.
The second ground assigned by the court was no justification of the decree of condemnation.
*39 Eor the foregoing reasons the conclusion of law is reached that the seizure and condemnation were illegal and that therefore the claimants have a valid claim for indemnity.
These conclusions of fact and of law, together with this opinion, will be reported to Congress.