Barney, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
The decree, reciting that the brig and cargo were lawful prize, declares that it was proven to the prize court that the clearance of the brig was simulated; that the true destination was the island of Antigua, “ but that it is a sequel of shipments of provisions for the British Army.” When we take into consideration the location of the brig at the time of capture, as well as other circumstances in the case, it cail not be and is not disputed that the brig in question was actually destined for the island of Antigua.
With this statement of the case the question for decision is whether the capture and the condemnation were illegal or otherwise.
As the island of St. Bartholomew, to which the brig was nominally bound, was a Swedish island, and thus neutral, no harm was done to France by the simulation of the voyage of the brig, and under the decision of this court in the case of the Betsey & Polly, 38 C. Cls., 30, that fact does not justify the seizure and condemnation and needs no further consideration.
*131 The seizure and condemnation of the brig took place in March, 1797, and while the treaty of 1778 between this country and France was still in force, so that the- determination of the issues of law in this case depends upon the rules of international law as modified by that treaty.
Article XXIY of that treaty is as follows:
“ The liberty of navigation and commerce shall extend to all kinds of merchandises, excepting those only which are distinguished by the name of contraband, and under this name of contraband or prohibited goods shall be comprehended arms, great guns, bombs with the fuses, and other things belonging to them, cannon balls, gunpowder, match, pikes, swords, lances, spears, halberds, mortars, petards, granades, saltpeter, muskets, musket ball, bucklers, helmets, breastplates, coats of mail, and the like kinds of arms proper for arming soldiers; musket rests, belts, horses with their furniture, and all other warlike instruments whatever. These merchandises which follow shall not be reckoned among contraband or prohibited goods; that is to say, all sorts of cloths, and all other manufactures woven of any wool, flax, silk, cotton, or any other materials whatever, all kinds of wearing apparel, together with the species whereof they are used to be made, gold and silver, as well coined as uncoined; tin, iron, latten, copper, brass, coals; as also wheat and barley, and any other kind of corn and pulse; tobacco and likewise all manner of spices; salted and smoked flesh, salted fish, cheese and butter, beer, oils, wines, sugars, and all sorts of salts; and in general all provisions which serve for the nourishment of mankind and the sustenance of life; furthermore, all kinds of cotton, hemp, flax, tar, pitch, ropes, cables, sails, sailcloths, anchors and any parts of anchors,also ships’ masts, planks, boards, and beams of what trees soever; and all other things proper either for building or repairing ships, and all other goods whatever which have not been worked into the form of any instrument or thing prepared for war by land or by sea shall not be reputed contraband, much less such as have been already wrought and made up for any other use; all which shall be wholly reckoned among free goods; as likewise all other merchandises and things which are not comprehended and particularly mentioned in the foregoing enumeration of contraband Soods; so that they may be transported and carried in the ?eest manner by the subjects of both confederates, even to places belonging to an enemy, such towns or places being only excepted as are at that time besieged, blocked up, or invested.” 8 Stat. L., 26.
*132 A careful examination of this article leads us to the conclusion that the contracting parties thereby modified the rules of international law as then recognized in two important particulars: (1) It made innocent or noncontraband a list of naval stores therein enumerated, such as tar,’ ropes, sailcloths, anchors, etc., which had theretofore been considered contraband. (2) It allowed free shipment by either party to ports of belligerents of the other party, all merchandise not therein specified as contraband, only excepting such places as were “ blocked up or invested.”
Even if we accept the witty statements accredited to some diplomatists that the language of diplomacy is used to conceal the real meaning and intention, it would seem that the language used in said article relating to the freedom of commerce with belligerent powers was so plain and unambiguous that it was not intended to and could not be misunderstood. If it did not mean that commerce in all of the non-contraband articles therein specified should be free with all ports of the enemy of either party to the treaty not blockaded or invested it did not mean anything.
In the Cole case, 27 C. Cls., 116, Nott, Chief Justice, commenting upon another provision in this treaty, said:
“ It is manifest that the purpose of a treaty of amity and commerce between two friendly maritime powers must have been to mitigate, and not to augment, the severities of international law.” Id. 121.
But this article was under consideration by the contracting parties in 1795, and no doubt was left as to the understanding of its meaning by this Nation. Under date of June 30, 1795, the minister plenipotentiary of the French Republic addressed a letter to Mr. Randolph, our then Secretary of State, calling attention to the fact that the so-called Jay treaty, which shortly previous to that time had been negotiated between this country and Great Britain, specified as contraband of war as between the contracting parties the same naval stores that were declared noncontraband in article 24 of the treaty between this Nation and France. Among other things he said:
“ The United States, therefore, in virtue of these acts, may freely transport to England hemp, flax, tar, peltry, cordage, *133 cables, sails, sailcloth, etc., and every other thing proper for the construction or repair of vessels, without apprehending any hindrance on our part, while, by the articles of the treaty with England, the United States can not carry to us any of the articles proper for the construction of vessels, since the English have the power of seizing them. The United States have therefore granted to England a right which we have not and which in the course of the present war inclines the balance in favor of England.” America State Papers, vol. 1, p. 594.
Under date of July 6, 1795, Mr. Randolph replied to this communication, in which he showed that by the Jay treaty we had not enlarged the list of contraband articles under international law and had “therefore willfully surrendered no right relative to contraband,” and further said:
“Nor is the treaty with France contravened by this acknowledgment of contraband. It stipulates that if France be at war and the vessels of the United States carry naval stores to her enemy, French cruisers shall not capture them. The proposed treaty admits the right of Great Britain to seize such vessels going to. her enemy. The inference is that France has relaxed her strict rights in consideration that the United States have relaxed theirs in this respect, but that Great Britain will not relax hers. The treaty with France, therefore, remains uninfluenced by the proposed compact with Great Britain.” American State Papers, vol. 1, p. 595.
It will thus be seen that both this Nation and France then took the position that article 24, as between the contracting parties, made noncontraband what was contraband under international law. That was unquestionably true, and being so, why did not the same article, as between the parties, change the rules of international law relating to commerce with the ports of a belligerent of either party in noncon-traband goods, including, of course, foodstuffs, unless such ports were either “ blockaded or invested ” ? It seems to us that there is but one answer to this question, and that is that it did, and from which it would follow that the seizure and condemnation of the claimant vessel and cargo was illegal.
We do not consider it necessary at this time to enter into a historical discussion of the question of the proper observance by either of the contracting parties of the treaties of alliance and commerce between France and the United *134 States of February 6, 1778. That was done in a most complete and scholarly manner by the late Judge Davis in Gray's case, 21 C. Cls., 340, and Hooper’s case, 22 C. Cls., 408, and those opinions may well be referred to as classics upon that subject. The conclusion reached is found in the following statement:
“ The treaties of 1778, particularly the treaty of commerce, which is the important one for our purposes, were in existence until the passage of the abrogating act. Whatever disputes occurred between this country and France during the disturbed period following the conclusion of the Jay treaty arose from differences of interpretation of various clauses of the Franco-American treaty, and on neither side do we find seriously advanced a contention that the treaties were not in existence and were not binding upon both nations. The United States distinctly urged their enduring force, while the French departed from this position only in this (if it be a departure), that the Jay treaty introduced a modification into their treaty with us, of which they were entitled to the benefit.
“ We are of opinion that the treaties of 1778, so far as they modified the law of nations, constituted the rule by which all differences between the two nations were to be measured after February 6, 1778, and before July 7, 1798.” Hooper’s case, 416.
That ruling has been followed by this court in the consideration of this class of cases ever since and is not open to serious discussion at this time.
Without taking into consideration the treaty of 1778 we think the seizure and condemnation of the brig in question was illegal under the rules of international law. The question involved is under what circumstances are foodstuffs liable to seizure and condemnation as contraband when shipped between neutrals and belligerents, and this question is particularly important to this country at the present time.
The only fact found in the decree of condemnation was that the brig was destined for Antigua. It is said that it is a “ sequel ” of shipments of provisions for the British Army; in other words, that was an inference, and only an inference, which the prize court drew from the fact that the brig was bound for Antigua; but this court has the same right to draw its inference from the facts in the case as the prize *135 court had. Neither was the false documentation of the brig any evidence of intention to supply provisions to the British Army if the brig could properly have been documented to the island of Antigua, as we think can be shown.
When the decree of condemnation of a prize court comes up for consideration in another court, the facts stated as the reason for the decree will be examined and passed upon. Hobbs v. Henning, 7 C. B., 791; Calvert v. Bovill, 7 T. R., 523.
At this time Antigua was one of the most important of the Leeward Caribbean Islands and contained about 60,000 acres of fertile land, mostly devoted to the cultivation of sugar, cotton, and tobacco, 1 Edwards, 484. Even in 1774 it produced 17,000 hogsheads of sugar, id., 485. In 1787 there was shipped from Antigua in 71 ships to the United States 375, 150 gallons of rum, besides more than 3,300 tons of sugar, id., 506. The population of Antigua in 1791 was 2,590 whites, 37,808 slaves, besides a considerable number of persons of mixed blood and native free blacks, % Edwards, 2. The value of the imports of this island from Great Britain alone was over a million dollars, and of exports over two million dollars, 5 Edwards, Appendix, 31. Edwards says that no islands in that part of the West Indies could boast of so many excellent harbors, only two of which were fortified, 1 Edwards, 486.
These facts are stated to show that the island of Antigua was an island of some importance and devoted entirely to agriculture, raising principally sugar, cotton, and tobacco, with a considerable population in need of food from outside of its own limits. Let us see further what the facts were regarding this food supply.
In 1778 there was a scarcity of crops in Antigua, and we are told all of the negroes there would have perished had it not been for corn and flour imported from America, 1 Edwards, 485. For some time before the conclusion of the Jay treaty between this country and Great Britain in 1794 foodstuffs were not allowed to be imported into the West India Islands in American bottoms, and in consequence we are told there was great suffering there for want of food. The inhabitants petitioned Parliament to restore this com *136 merce with America, representing that there was danger of the slaves dying of hunger, 2 Edwards, 496-497. The complaint of this restriction of commerce with America and consequent lack of foodstuffs was bitter, and great joy was ex-pressed when the Jay treaty was concluded and these troubles and dangers removed, % Edwards, 524; and thereafter the West India Islands received the most of their food and lumber from the United States, 5 Edwards, Appendix, 48.
All of the foregoing goes to negative any presumption that foodstuffs destined for the island of Antigua were for the supply of a few troops stationed there. In fact, we are told that in the West Indies, where at that time the slaves greatly outnumbered the whites, as we have seen they did in Antigua, a considerable number of troops were constantly kept to suppress possible slave revolts, 1 Edwards, 280, 281; from which it follows that at least the militia in Antigua at the time of the condemnation in this case were for that purpose.
A brief revieAv of the leading cases upon the question as to when foodstuffs carried in neutral vessels to belligerent ports will be considered as contraband is thought to be proper for the purposes of this case.
In the case of Jonge Margaretha, 1 C. Rob., 189, it appears that the cargo was destined for Brest, carrying Dutch cheeses from Amsterdam. The vessel was neutral, but was carrying a cargo of provisions not the product of its own country, but the product of a country which was at that time an ally of France. It is stated in the opinion in that case that in the port of Brest at that time there was a considerable French fleet in a state of preparation for sallying forth on a hostile expedition, and that this cargo of cheese was being taken there for the purpose of supplying this fleet. In discussing this question Sir William Scott said:
“ The nature and quality of the port to which the articles were going is not an irrational test. If the port is a general commercial port, it shall be understood that the articles were going for civil use, although occasionally a frigate or other ships of war may be constructed in that port. Contra, if the great predominant character of a port be that of a port of naval military equipment it shall be intended that the articles were going for military use, although merchant ships resort to the same place and although it is possible that the articles might have been applied to civil consumption.”
*137 Further along he refers to the case of the Endraught, cited by the claimant in that case, the destination of which was Bordeaux, and in which case the seizure was declared illegal. Upon that case he remarks:
“ Though smaller vessels of war may be occasionally built and fitted out there it is by no means a port of naval military equipment in its principal occupation in the same manner as Brest is universally known to be.”
In the case of the Edward, 4 C. Rob., 68, the ship was Prussian, with a cargo of wines claimed for Prussian subjects on a voyage from Bordeaux ostensibly to Emden, a neutral port in Hanover, but the court found in that case that there was an evident intention on the part of the master to carry the cargo into Brest, a French port, “ where there was notoriously a large armament lying very much in want of articles of this kind — articles of an indispensable nature” — and it was found in that case that wines, which constituted a large part of the cargo of the vessel, were to be considered as naval stores, which were especially needed by the fleet at Brest, as the latter port was not within a wine country.
The Commercen, 1 Wheat., 382, is the leading case in this country upon this question. That was a Swedish vessel on a voyage from Limerick in Ireland to Bilboa in Spain, and was captured on the 16th day of April, 1814. Bilboa at that time was the rendezvous for the British forces in Spain (and Great Britain had no other citizens there), and it was found in that case by the official papers of the customhouse, as well as by the private letters of the shippers, that the cargo was shipped for the sole use of His Britannic Majesty’s forces then in Spain. In the opinion in that case Justice Story says:
“ But if such goods are destined for the direct and avowed use of the enemy’s army or navy, we should be glad to see an authority which countenances this exemption from forfeiture.”
And further along states:
“ Here is a cargo of provisions exported from the enemy’s country with the avowed purpose of supplying the army of the enemy.”
*138 In all of these cases it appeared that the facts found showed that the vessels were unquestionably destined to supply either the enemy’s naval or military equipment, and it by no means follows that because the belligerent power may have some forces, either naval or military, stationed at the port for which the vessel was bound, that that fact alone makes the cargo subject to condemnation, but that it must further appear that the cargo was intended for the supply of such naval or military forces. In other words, because a few naval vessels may be stationed at a port or a small military force may be located there does not deprive the inhabitants of that port or locality of the privilege of receiving necessary food from neutral nations.
The following language, quoted from Hall on Int. Law, page 619, is here applicable:
“ To divert food from a large population when no immediate end is to be served, because it may possibly be intended to form a portion of supplies which in almost every case an army or a squadron could complete from elsewhere with little inconvenience, would be to put a stop to all neutral trade in innocent articles. But writers have been satisfied with a broad statement of principle, and they have overlooked an exceptional and no doubt rare case, in which, as it would seem, provisions may fairly be detained or confiscated. If supplies are consigned directly to an enemy’s fleet, or if they are sent to a port where the fleet is lying, they being in the latter case such as would be required by ships, and not ordinary articles of import into the port of consignment, their capture produces an analogous effect to that of commissariat trains in the rear of an army. Detention of provisions is almost always unjustifiable, simply because no certainty can be arrived at as to the use,which will be made of them; so soon as certainty is in fact established, they and everything else which directly and to an important degree contributes to make an armed force mobile, become rightfully liable to seizure. They are not less noxious than arms; but except in a particular juncture of circumstances their noxiousness can not be proved.”
We also quote from Taylor's Int. Law, page 737:
“ Despite the suggestion made by Lord Stowell in the case of the Ranger, that a claim might legally be made to condemn all provisions whether intended for military consump *139 tion or not, the sounder view undoubtedly is that provisions can only be contraband when intended for military use, or when sent to ports actually besieged or blockaded.”
Some international law writers even went so far as to say that foodstuffs never should be declared contraband. Blunt-schli, sec. 807.
In the case of the brig Lydia Allison, decided by this court at the last term, the facts in the case as to destination of the vessel, false route, cargo, etc., were almost exactly identical with those in the instant case, and this court decided the seizure and condemnation to be illegal.
In the Hooper case, 22 C. Cls., 408, the vessel was documented for Martinique, a British port, and was laden with food and lumber; she was seized in February, 1800, which was after the abrogation of the treaty of 1778, and destroyed. This court decided the seizure to be illegal, and in the course of the court’s opinion in that case it was said:
“ Martinique was neither blockaded nor besieged. It undoubtedly had a British garrison and was a refuge and sometimes a rendezvous for British armed vessels; at the same time it had a large civil population to be fed then, as it is now, largely by the products of the temperate zone. Its predominant character was not that of a port of naval or military equipment.”
This question was raised between the United States and Great Britain during the Boer War, in connection with the seizure of the vessels Beatrix, Maria, and Mashona, which were taken by British cruisers to Del ago a Bay. In the course of the correspondence Lord Salisbury, one of the greatest and most learned statesmen of Great Britain during the last century, thus defined the position of the British Government on the question of contraband:
“Foodstuffs with a hostile destination can be considered contraband of war only if they are supplies for the enemy's forces. It is not sufficient that they are capable of being so used. It must be shown that this was in fact their destination at the time of seizure?
This statement by Lord Salisbury is in harmony with what is laid down in Holland’s Manual of Naval Prize Law, issued by the British administration in 1888.
*140 In the war between Russia and Japan the Russian Government issued to its naval officers instructions in which foodstuffs were designated as contraband of war. The British Government protested against this prohibition, which included rice and provisions as unconditional contraband, this being regarded as “ inconsistent with the law and policy of nations.” The British Government, it was declared, did not contest that “ in particular circumstances provisions may acquire a contraband character, as, for instance, if they should be consigned direct to the army or fleet of a belligerent or to a port where such fleet may be lying,” but it could not admit that “if such provisions were consigned to the port of a belligerent (even though it should be a port of naval equipment) they should therefore be necessarily regarded as contraband of war.” The true test appeared to be “whether there are circumstances relating to any particular cargo to show that it is destined for military or naval use.” John Bassett Moore, Contraband of War, p. 35.
August 30, 1904, Mr. John Hay, our then Secretary of State, sent a letter of instructions to Mr. McCormick, our ambassador at St. Petersburg, regarding this same matter, in which he used the following language:
“When war exists between powerful States it is vital to the legitimate maritime commerce of neutral States that there should be no relaxation of the rule — no deviation from the criterion for determining what constitutes contraband of war, lawfully subject to belligerent capture, namely, warlike nature, use, and destination. Articles which, like arms and ammunition, are by their nature of self-evident warlike use, are contraband of war if destined to enemy territory; but articles which, like coal, cotton, and provisions, though ordinarily innocent are capable of warlike use, are not subject to capture and confiscation unless shown by evidence to be actually destined for the military or naval forces of a belligerent.”
From all these authorities it appears that it must affirmatively be found, in order to make foodstuffs contraband (except in case of blockade or investment), that the food was destined to supply the belligerent’s army or naval forces, and no such presumption arises simply from the fact that there is either a naval or army equipment at the destination, *141 if there are noncombatants there in need of food; and any other rule would be cruel and inhuman.
As was said in the Resolution, 2 Dallas, 19:
“A question is made: On whom lies the onus probandi? We think the captors. There can be no condemnation without proof that the ship or cargo is prize.” Id., 22.
War is severe enough without adding to it by imposing suffering and starvation upon defenseless human beings who are so unfortunate as to be living in belligerent territory where there happens to be a few soldiers quartered. Instead of there being any presumption or fear of a “ sequel ” that this considerable shipload of corn and flour was going to Antigua for the supply of the few troops stationed there, there was every presumption, amounting almost to a certainty, that it was being carried there as a food supply for the inhabitants of the island. Certainly that presumption should prevail until there is something more than a mere suspicion to the contrary, based entirely upon the fact that a few troops happened to be stationed at one or two of the numerous ports on the island. See Resolution, supra.
But what are the facts in this case ? The cargo, consisting entirely of foodstuffs and a few staves, was destined not to any particular port, but generally to the island of Antigua, where there were ten times as many noncombatants in need of food as soldiers; and there is nothing to show that it was destined to either of the two fortified ports among the many ports of that island. And what if it was? We know of no case where it has been held that the inhabitants of fortified towns can not be fed by neutral vessels. All important seaport towns are more or less fortified.